**EL–SHIFA PHARMACEUTICAL INDUSTRIES COMPANY and Salah El Din Ahmed Mohammed Idris, Plaintiffs,**

v.

**The UNITED STATES of America, Defendant.**

No. 00–443L.

United States Court of Federal Claims.

March 14, 2003.

Stephen J. Brogan, Jones, Day, Reavis & Pogue, Washington, D.C., for Plaintiffs. With him on the briefs were Timothy J. Finn, Jonathan C. Rose, Daniel H. Bromberg, and Michael S. Fried, Jones, Day, Reavis & Pogue, of counsel.

Peter H. Oppenheimer, Environment and Natural Resources Division, Department of Justice, Washington, D.C., for Defendant. With him on the briefs were Thomas L. Sansonetti, Assistant Attorney General, Department of Justice; Mario Barnes, Department of the Navy; William Reyes, Department of Defense; Julian D. Schreibman, Central Intelligence Agency; George Taft, State Department; and Sean M. Thorton, Department of the Treasury, of counsel.

### OPINION

BASKIR, Judge.

■ This "takings" case arises out of terrorist attacks against the United States in 1998 and the American military response to these attacks. It comes before the Court on the Government's Motion to Dismiss for lack of jurisdiction and for failure to state a claim. Because we find that the U.S. Constitution's Fifth Amendment "just compensation" clause does not extend to claims arising out of the destruction of a purported enemy war-making instrumentality through American military action, we GRANT the Defendant's motion and dismiss the Complaint.

## BACKGROUND

### A. The Precipitating Events

On August 7, 1998, in near simultaneous attacks, the American Embassies in Nairobi, Kenya, and Dar es Salaam, Tanzania, were destroyed by truck bombs. Over 300 people were killed and another 5,000 were injured.

On August 20, 1998, in retaliatory actions by the U.S. military, personally ordered by the President of the United States, Tomahawk cruise missiles were launched against what were said to be terrorist targets in Afghanistan and Sudan. We quote at length first from the President's remarks that afternoon at a school in Martha's Vineyard, Massachusetts. In his remarks, the President identified the enemy as a terrorist group, not a nation-state. The targets were an operational base and a chemical weapons-related facility which posed threats to America's national security. The President gave four reasons which impelled him to act:

Today I ordered our Armed Forces to strike at terrorist-related facilities in Afghanistan and Sudan because of the threat they present to our national security.

\* \* \* \* \* \*

The United States launched an attack this morning on one of the most active terrorist bases in the world. It is located in Afghanistan and operated by groups affiliated with Usama bin Ladin, a network not sponsored by any state but as dangerous as any we face. We also struck a chemical weapons-related facility in Sudan. Our target was the terrorists' base of operation and infrastructure. Our objective was to damage their capacity to strike at Americans and other innocent people.

I ordered this action for four reasons: first, because we have convincing evidence these groups played the key role in the Embassy bombings in Kenya and Tanzania; second, because these groups have executed terrorist attacks against Americans in the past; third, because we have compelling information that they were planning additional terrorist attacks against our citizens and others with the inevitable collateral casualties we saw so tragically in Africa; and fourth, because

they are seeking to acquire chemical weapons and other dangerous weapons.

2 PUBLIC PAPERS OF THE PRESIDENT, WILLIAM J. CLINTON 1460–62 (1998).

The President followed these remarks with a formal statement from the Oval Office later in the day. In it, he described the targets as enemy-related facilities that posed an "imminent threat" to the United States. He described the Sudan target as a factory "associated" with terrorist figure Osama bin Laden (alternatively, "Usama bin Ladin") producing "materials for chemical weapons." We quote from the President's Address to the Nation on Military Action Against Terrorist Sites in Afghanistan and Sudan:

Today I ordered our Armed Forces to strike at terrorist-related facilities in Afghanistan and Sudan because of the imminent threat they presented to our national security.

Our target was terror; our mission was clear: to strike at the network of radical groups affiliated with and funded by Usama bin Ladin...

I decided America must act. And so this morning, based on the unanimous recommendation of my national security team, I ordered our Armed Forces to take action to counter an immediate threat from the bin Ladin network.

Earlier today the United States carried out simultaneous strikes against terrorist facilities and infrastructure in Afghanistan.

Our forces also attacked a factory in Sudan associated with the bin Ladin network. The factory was involved in the production of materials for chemical weapons.

*Id.*

Finally, the President made a formal report to Congress pursuant to the War Powers Resolution on August 21, 1998:

At approximately 1:30 p.m. eastern daylight time, on August 20, 1998, at my direction, U.S. forces conducted strikes in Afghanistan against a series of camps and installations used by the Usama bin Ladin organization, and in Sudan where the bin Ladin organization has facilities and extensive ties to the government ... United

States forces struck a facility in Sudan being used to produce materials for chemical weapons.

\* \* \* \* \* \*

The United States acted in exercise of our inherent right of self-defense consistent with Article 51 of the United Nations Charter. These strikes were a necessary and proportionate response to the imminent threat of further terrorist attacks against U.S. personnel and facilities. These strikes were intended to prevent and deter additional attacks by a clearly identified terrorist threat. The targets were selected because they served to facilitate directly the efforts of terrorists specifically identified with attacks on U.S. personnel and facilities and posed a continuing threat to U.S. lives.

\* \* \* \* \* \*

I directed these actions pursuant to my constitutional authority to conduct U.S. foreign relations and as Commander in Chief and Chief Executive.

*Id.* at 1464.

As the succeeding four and a half years have made tragically clear, the attack in Afghanistan failed to kill Osama bin Laden, or to have measurably impaired the operations of his infamous terrorist group, the al-Qaeda. The attack in Sudan was, however, successful, at least to the extent that the facility was substantially, if not completely, destroyed.

**B. *The Complaint***

On July 27, 2000, the Plaintiffs, El–Shifa Pharmaceutical Industries Company ("the Company" or "El–Shifa") and Mr. Salah El Din Ahmed Mohammed Idris, filed a multipurpose Complaint in this Court seeking "takings" compensation in the amount of $50 million for the destruction of the Sudan facility. We say multi-purpose because Plaintiffs made the same allegations in an administrative claim for damages before the Central Intelligence Agency, and in a Complaint filed in United States District Court for the District of Columbia (Case No. 1:01–CV–00731), pursuant to the Federal Tort Claims Act. Also, House Resolution (H.Res.) 81 was introduced in the 107th Congress to refer the claim to this Court for a "Congressional Reference" report in support of a private relief bill. The resolution was never acted on.

The Complaint in its entirety alleges essentially the following: Mr. Idris is the principal owner of the El–Shifa company. A native of Sudan, he emigrated to the Kingdom of Saudi Arabia, became a citizen of that nation, and became a highly successful businessman and banker. In March 1998, he purchased shares of El–Shifa Pharmaceutical Company, a corporation organized under the laws of Sudan.

The Company owns and operates the El–Shifa pharmaceutical plant in Khartoum, the capital of Sudan, and is the largest such facility in the country. It produces fifty percent of the pharmaceuticals distributed in Sudan. The plant then and at all times produced consumer pharmaceuticals. As to the allegations of the President that the plant was controlled by terrorists and was producing chemical weapons or their ingredients, the Complaint emphatically denies these charges. It relates what it describes as the Clinton Administration's steady retreat over succeeding days and weeks from the President's original assertions. It quotes press accounts and remarks attributed to high-level Clinton Administration officials modifying and then retracting allegations of the plant's war-making, chemical weapons nature and its connections to Osama bin Laden or al-Qaeda. For example:

> The *Chicago Tribune* reported on August 28, 1998, "[s]ince the attack, . . . the Clinton administration has altered its arguments, sometimes in the face of ambiguous evidence. Officials now admit that the plant produced medicines sold commercially in Sudan. Scientists in the U.S. and Europe maintain that the chemical EMP-TA has potential commercial applications as well as being a precursor for VX nerve gas."

Compl. ¶ 74a.

The Complaint also describes Administration efforts to link Mr. Idris to Osama bin Laden, Al-Qaeda and other terrorist groups:

> As justifications for the attack crumbled, U.S. officials began to claim that Mr. Idris

was a "partner" with bin Laden, in yet another bad faith attempt at post hoc rationalization for the raid.

Compl. ¶ 75.

On August 31, 1998, an unnamed U.S. official told the press that the U.S. "suspect[ed]" that Mr. Idris was "involved in money laundering, that he's involved in representing a lot of bin Laden's interests in Sudan."

Compl. ¶ 76.

Mr. Idris unequivocally denied these allegations:

All of these charges are categorically false. Mr. Idris has never met Usama bin Ladin, he is not a partner with Usama bin Ladin in any business ventures, he has had no dealings with bin Laden, commercial or otherwise, and he is not a financial supporter of bin Ladin or of Islamic Jihad. Mr. Idris maintains a residence and does business in Egypt, which would certainly not be possible if the Egyptian government believed he had any ties to the Islamic Jihad (which was responsible for the assassination of Anwar Sadat).

Compl. ¶ 79.

Although the United States blocked some of Mr. Idris' foreign bank accounts according to the Complaint, it lifted the freeze on those accounts rather than defend its action in court.

In addition to this extensive defense of Mr. Idris, the Complaint seeks compensation for what it describes as the "purposeful" destruction without factual basis of a peaceful, that is, non-military factory that produced consumer pharmaceuticals:

The destruction of the Plant, its fixtures, equipment, and inventory constituted a "taking" of private property for public use within the meaning of the Fifth Amendment to the United States Constitution.

Compl. ¶ 91.

### C. *The Government's Motions*

In response, the Government did not file an answer. Instead, it moved to dismiss the Complaint, initially asserting three independent defects—personal jurisdiction, subject matter jurisdiction, and standing. First, it invoked 28 U.S.C. § 2502(a) (2000). That statute limits a non-citizen litigant's right to sue in this Court, making it contingent upon an equivalent right of judicial access by American citizens in the courts of the Plaintiff's country. Second, the Government asserted that this is a maritime tort claim, over which Federal District Courts have exclusive admiralty jurisdiction, because the missiles had been fired from United States warships operating in international waters. Finally, the Government challenged the Plaintiffs' standing, arguing that the Fifth Amendment's "Takings Clause" does not extend to foreign-owned property located on foreign territory.

After initial briefing and argument, the parties were asked to brief: (1) the justiciability of this dispute under the political question doctrine and, (2) the Takings Clause's application to military action in general and as respects the doctrine of "military necessity," in particular. The parties were also instructed to discuss the application to this case, if any, of *Perrin v. United States,* 4 Ct.Cl. 543, 1800 WL 685 (1868), *aff'd,* 12 Wall. 315, 79 U.S. 315, 7 Ct.Cl. 223, 20 L.Ed. 412 (1870), and similar authorities addressing the Takings Clause in a military context.

In the course of this supplemental briefing, the Government appeared to be moving the Court to dismiss on the additional grounds of military necessity, something it had initially declined to do. After the Plaintiffs pointed out procedural irregularities in this attempt, the Court advised the Government that if it wished to make a further motion, it should do so formally. This the Government did, and its further motion was fully briefed, making three rounds of briefing on the motion to dismiss. The Court later conducted a second hearing on these issues. The parties' written and oral advocacy has been uniformly excellent.

The Court is unpersuaded by the initial three theories advanced by the Government, and so it becomes necessary to explore the dimensions of the Fifth Amendment's Takings Clause itself to determine whether it applies in these circumstances. We conclude that the Takings Clause does not extend to

claims arising out of military operations against enemy war-making instrumentalities.

## DISCUSSION

### A. Plaintiffs' Privilege to Sue

 Among the Government's initial theories for dismissal is its allegation that the Court lacks personal jurisdiction under RCFC 12(b)(2). Pursuant to 28 U.S.C. § 2502(a), a foreign national may maintain a suit against the United States in the Court of Federal Claims if United States citizens enjoy a reciprocal right to sue the plaintiff's government in one of its courts of law. The foreign plaintiff has the burden of establishing this reciprocity. See Pottawatomi Nation in Canada v. United States, 27 Fed.Cl. 388, 390 (1992); Aktiebolaget Imo–Industri v. United States, 101 Ct.Cl. 483, 490, 54 F.Supp. 844 (1944) (under predecessor reciprocity provision). The Defendant argues that El–Shifa has failed to do so.

 The Plaintiffs provided a variety of authoritative sources on the law of Sudan. In support of their position that American citizens are able to pursue claims against Sudan, Plaintiffs submitted the statements of experts in Sudanese law. We have also been shown the opinions of persons who have presided in those courts, practiced before them, and studied their decisions. See Pls.' Opp'n (Mar. 15, 2001) at App. tabs 2–4 (Decl. of Zaki Abdel Rahman Mohammed Khair; Decl. of El Hussein Ahmed Salih; and Decl. of Ghazi Suleiman). The evidence demonstrates that the Constitution of the Republic of the Sudan guarantees for all persons the right to prosecute claims against the government. This evidence, unchallenged on its own terms by the Government, satisfies the Plaintiffs' prima facie burden.

The Government, for its part, offered no evidence disputing the Plaintiffs' showing of the legal rights afforded Americans. It did not quarrel with the fact that the text of the Sudanese Constitution gave United States citizens the same rights as Sudanese citizens. However, the Government waited until its reply brief—which precluded a rebuttal by Plaintiff—to cite some allegedly contrary constitutional provisions. For the most part

the Government made certain conclusory and not otherwise supported assertions in its written papers. We take these to be assertions of counsel only. Further, the Government couched its assessment of Sudanese law in qualifying terms, which betray the equivocal nature of its case. See Def.'s Mot. to Dismiss (Jan. 29, 2001) at App. A, Decl. of George Taft, Office of African Affairs, Office of the Legal Advisor, U.S. State Department ¶ 16 (Taft Decl.) ("The status of relations between the governments ..., the unstable security situation within Sudan, and the general subservience of the Sudanese judiciary to the government raise serious doubt whether a U.S. citizen would enjoy the same access to Sudanese courts as Sudanese citizens, and whether a U.S. citizen would be able to effectively prosecute a claim in Sudanese courts against the Government of Sudan.") (emphasis added).

The Government's briefs charged that the actual political situation in the Sudan negated any idea that the courts were independent. The papers emphasize that the courts, like all aspects of the Sudanese Government, are subject to Islamic law and are apparently compromised as a consequence. The Government points to Sudan's support of international terrorism and its history of human rights abuses, resulting in tenuous diplomatic relations with the United States, and an official State Department travel advisory restricting travel to Sudan. The Defendant suggests that the Sudanese judiciary has lost its independence and become an instrumentality of discrimination against non-Muslims. In sum, the papers assert that relations between the United States and Sudan are so bad that no American citizen has any realistic hope of obtaining justice in a Sudanese court for a similar claim.

These assertions are deficient. First, the Government proffers no first-hand authority for them at all, neither official nor academic. Its affiant, George Taft, cites unnamed sources for his conclusions:

I made inquiries by telephone and in person of the Department of State's Office of the Legal Advisor and the Bureau of African Affairs to ascertain whether the Department possesses any relevant docu-

ments or other info concerning whether U.S. citizens have a real and effective legal access to the courts of Sudan and Saudi Arabia on the same terms as citizens of those countries, whether citizens of those countries have the right to sue their own governments, and whether U.S. citizens are afforded the same right.

Taft Decl. ¶ 8.

The claims are, as we have said, merely proffers by counsel, albeit these proffers come from a State Department attorney serving as "Of Counsel" on this case. The Defendant has also cited State Department reports indicating that basic civil liberties have been suspended by the Sudanese President in the wake of a declared state of emergency. But the Government carefully avoided the Court's invitation that it produce an official statement from the State Department substantiating the claims made in the briefs.

The implications, of course, are that Sudan's Constitution and the power of its judiciary will not be exercised with vigor. However, the Government has not shown this to be the case. Thus, we find that the Government has not rebutted the Plaintiffs' prima facie case with persuasive evidence.

At bottom, the Government's case consists of an assessment of the political situation within Sudan, and its political relations with the United States. We note that press accounts of United States—Sudanese political relations over these past several months suggest that they are in flux, sometimes improving, sometimes not, and by no means as simple and clear cut as Government counsel states. Diplomatic relations between the United States and Sudan are at least formally in place. In any event, we do not think that Section 2502(a)'s statutory requirement is to be determined by the political assessment of counsel, the Court, or *New York Times* foreign correspondents. The Government has offered no legal authority suggesting that section 2502(a) compliance is to be measured solely by this country's political relations with a foreign government.

As a practical matter, a United States citizen may indeed find it difficult to maintain a civil cause of action against the government of Sudan in its own courts, especially under the current state of affairs. This is certainly a weighty consideration. See *Nippon Hodo Co. v. United States*, 152 Ct.Cl. 190, 193, 285 F.2d 766 (1961) ("We would carefully measure the scope of our jurisdiction in a situation where a rule in a foreign law book permits Americans free access to the courts but where it appears in practice that Americans are barred from the courts."). But the Government can not rebut reciprocity by focusing merely on "how receptive the [Sudanese] courts would have been to a [takings] claim brought by a [United States citizen]." *Pottawatomi*, 27 Fed.Cl. at 392. Nor do the Plaintiffs have to demonstrate that a similar claim brought by an American would likely prevail in Sudan. *Id.*

Our inquiry does not end with either the Defendant's unsubstantiated allegation that strained foreign relations diminish the rights of Americans in the Sudan, or with its more subtle inference that religious fundamentalism destroys those rights. No matter what the alleged political landscape, we are required to look at reciprocity as a legal matter. *See, e.g., Russian Volunteer Fleet v. United States*, 282 U.S. 481, 491–92, 51 S.Ct. 229, 75 L.Ed. 473 (1931) (Russian corporation permitted to pursue takings claim irrespective of lack of official U.S. recognition of Soviet government at that time.); *Zalcmanis v. United States*, 146 Ct.Cl. 254, 256, 173 F.Supp. 355 (1959) (where treaty allowed United States citizens access to Latvian courts, fact that courts were no longer maintained due to the exile of Latvian government did not preclude Latvian claimant's suit in Court of Claims).

The right of a citizen of the United States to prosecute claims in Sudan, even assuming they are impaired by strained diplomatic relations between the two nations, still exists as a legal matter. Based on generally recognized principles of reciprocity, we are compelled to observe that legal right. The Government has produced no official statement to the contrary, nor has it persuaded us through anecdotal evidence or otherwise that access to Sudan's legal system is illusory. The most that the Defendant can contend in good faith is that it is *"highly unlikely"* that a U.S. citizen would enjoy the same access to

Sudanese courts as Sudanese citizens, *and even more unlikely* that a U.S. citizen could effectively prosecute a claim in Sudanese courts against the government of Sudan." Def.'s Mot. at 24 (emphasis added).

We conclude by noting that the Defendant has focused entirely on Sudan, the jurisdiction in which El–Shifa is incorporated and its plant located. The Government has conceded there is American access to the courts of Saudi Arabia, the jurisdiction where the individual Plaintiff, Mr. Idris, claims his citizenship. *See* Taft Decl. ¶¶ 8–9. However, it avoids the issue, summarily asserting that the legally cognizable property interests at stake belong solely to the Plaintiff corporation. But the Government has not challenged Mr. Idris' status as a Plaintiff by appropriate motion.

The Government has not rebutted the affirmative case made by the Plaintiffs pursuant to 28 U.S.C. § 2502(a). We reject the Defendant's motion to dismiss on this ground.

## B. *Admiralty Jurisdiction*

■ Pursuant to Rule 12(b)(1), the Government raises a lack of subject matter jurisdiction in its motion to dismiss, claiming our Tucker Act jurisdiction does not extend to maritime tort claims. At the outset we note that the Government's argument is rhetorically confusing since the Court's Tucker Act jurisdiction, upon which this claim is based, does not extend to tort claims of any sort, maritime or otherwise. *See* 28 U.S.C. § 1491(a)(1) (1994) ("The United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress ... in cases not sounding in tort.").

The Defendant's motion raises the question: Just what does determine whether one should be in a court of Admiralty jurisdiction? In one of Patrick O'Brian's famous tales of the sea in the early 19th Century, the question was put to an attorney, and the following discourse ensued:

"Why, sir," said the lawyer, "if the persecution were tortious, and if it happened at sea, or even on fresh water or reasonably damp land, the Admiralty court would no doubt have cognizance."

"Pray, sir," said Stephen, "just how damp would the land have to be?"

"Oh, pretty damp, pretty damp, I believe. The judge's patent gives him power to deal with matters in, upon, or by the sea, or public streams, or freshwater ports, rivers, nooks and places between the ebb and flow of the tide, and upon the shores and banks adjacent—all tolerably humid."

PATRICK O'BRIAN, THE FAR SIDE OF THE WORLD 51 (1984). Reluctant as we are to take this definition from English strangers at sea, the Government's claims for admiralty jurisdiction are equally expansive.

Congress has clarified the reach of maritime jurisdiction, leaving no doubt that it applies even on land in certain instances. Under the Admiralty Jurisdiction Extension Act:

The admiralty and maritime jurisdiction of the United States shall extend to and include all cases of damage or injury, to person or property, caused by a vessel on navigable water, *notwithstanding that such damage or injury be done or consummated on land.*

46 U.S.C.App. § 740 (1994) (emphasis added). Defendant claims that because the cruise missiles were fired from U.S. warships in international waters, El–Shifa's tort claim is maritime in nature and falls within the exclusive admiralty jurisdiction of the District Courts, even where the alleged harm occurred on land.

More fundamental than the alleged maritime situs of the injury, is the theory of the claim—tort versus taking. The former belongs in District Court but the latter falls within this Court's expertise even where the taking occurs on the High Seas. *See e.g. Am. Mail Line Ltd. v. United States*, 101 Ct.Cl. 377, 388–89, 1944 WL 3726 (1944) (ocean liners requisitioned for evacuation of American citizens adjudicated as takings claim); *Cent. Gulf Lines, Inc. v. United States*, 209 Ct.Cl. 773, 775, 1976 WL 23864 (1976) (considered whether takings or purely maritime contract involved).

The Government's argument rests on the assumption that the Complaint alleges a tort. Indeed, as we have noted with a multitude of excerpts, the Complaint does contain tort-like allegations, especially as it serves to rebut the Administration's justification for the attack. But we also recognize that this "multi-purpose" Complaint, as we termed it, alleges a Fifth Amendment taking. For our purposes, we regard the Complaint's challenges to the Administration's characterizations as Mr. Idris' understandable rebuttals to these attacks on his character and reputation. For the litigation in our Court, we consider them rhetorical "window dressing" to the underlying takings claim.

The Court insisted during the presentation of oral arguments that Plaintiffs disavow any claim of negligence, at least for purposes of this case in this Court. We recognize that Plaintiffs may persist in advancing alternative theories in another forum using similar text from their Complaint. Even so, we have seen counsel slip into the language of tort law in countering the Government's military necessity defense, which we will address shortly. For purposes of the purely jurisdictional motion before us now, however, we hold Plaintiffs to their stipulations. Plaintiff alleges a taking under the Fifth Amendment, not a tort. The Court of Federal Claims, not the District Court, has subject matter jurisdiction over takings.

We thus regard as irrelevant the Government's argument that the Plaintiffs allege a tort that is maritime in nature. But even were we to address the Government's argument on the merits, we would be unpersuaded. It is true that the District Court's admiralty jurisdiction may extend to injuries caused on *terra firma*. But that jurisdiction is, nevertheless, established by a "connection with maritime activity." *Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.*, 513 U.S. 527, 534, 115 S.Ct. 1043, 130 L.Ed.2d 1024 (1995). Claims subject to the exclusive admiralty jurisdiction of the district courts are those involving actions that have a "potential disruptive impact on maritime commerce," and have a "substantial relationship to traditional maritime activity." *Grubart*, 513 U.S. at 534, 115 S.Ct. 1043 (quoting *Sisson v. Ruby*, 497 U.S. 358, 364–65 & n. 2, 110 S.Ct. 2892, 111 L.Ed.2d 292 (1990)). Tort—takings distinction aside, that connection does not exist here.

In this regard, we take notice of a few facts which put the Government's claim in practical perspective. First, El–Shifa's destruction was brought about not through an inadvertent mishap on the high seas; it was caused very intentionally and deliberately by a weapon known as the Tomahawk *Land* Attack Missile ("TLAM" or "Tomahawk") (emphasis added). Though launched at sea, its intended target here was on land.

According to official data gathered by the Navy at the Plaintiffs' request, the Tomahawk has a maximum effective range of anywhere from 500 miles to 1,000 miles, depending upon the source. The missile, powered by a jet engine, is guided not by the launching vessel on navigable waters, but rather by continual in-flight adjustments, based on Global Positioning Satellite data, as it navigates along a pre-programmed route. The initial flight path is determined from geographical images and terrain features programmed at a remote site, not on the launching vessel, 24–80 hours before the mission. *See* General Accounting Office, *Cruise Missiles: Proven Capability Should Affect Aircraft and Force Structure Requirements* (1995); United States Navy Fact File: Tomahawk Cruise Missile, at http://www.chinfo. navy.mil/navpalib/factfile/missiles/weptoma. html (last modified Nov. 28, 2000). By all accounts, the system is extremely accurate; the likelihood of the weapon missing its intended target is slim. Finally, we note that Khartoum, the city of Chinese Gordon's fame, borders a desert some 400 miles from the nearest international body of water—the narrow and contained Red Sea, and hundreds of additional miles from the larger Arabian Sea.

We make these points to suggest that the choice of weapon—more accurately, the choice of launch platform for the Tomahawk missile—was apparently a matter of operational decision, dictated by military and political considerations about which we cannot even speculate. But there seems to be nothing essentially maritime about the choice of

weapons platform. We asked counsel during argument whether an air-launched cruise missile attack would be subject to maritime jurisdiction if the launching aircraft were all carrier-based, or perhaps partly land and partly carrier-based. Counsel could give no satisfactory answer.

The authorities in this area indicate that the mode of launch is not dispositive. Missile attacks on vessels at sea have implicated maritime jurisdiction when launched from a shore-based installation, *Szyka v. U.S. Sec'y of Defense,* 525 F.2d 62, 64 (2d Cir.1975), or naval aircraft, *T.J. Falgout Boats, Inc. v. United States,* 508 F.2d 855, 857–58 (9th Cir.1974).

Of course, the fact that the injury occurred on land is also not automatically dispositive, given the explicit terms of the extension of admiralty jurisdiction under 46 U.S.C.App. § 740. Yet that statute does not do away with the need to trace the injury on land back to a maritime activity. The admiralty cases of land-based damages offered by the Government are dissimilar, procedurally and factually, from this case. The closest the Government can offer is the *Grubart* case, in which a shore-based operation caused flooding of a freight tunnel under the Chicago River and subsequent flooding damage to nearby buildings. Because the damage to land-based structures was directly caused by an errant barge in the river, the Supreme Court noted its rejection of a strict situs theory and determined that the claim fell under maritime jurisdiction. *Grubart,* 513 U.S. at 535–36, 115 S.Ct. 1043 (Court looks both at location and maritime connection).

Direct maritime causation and shore-based consequences supported maritime jurisdiction. We have neither here. The destruction of El–Shifa was not directly caused by the naval vessel or even an appurtenance attached to the vessel. *See Grubart,* 513 U.S. at 536, 115 S.Ct. 1043. It was caused by a Tomahawk Land Attack Missile that happened to be transported via ship. Moreover, the destruction of a facility in the middle of desert is a far cry from the damage to buildings surrounding the Chicago River.

Neither the mode of attack nor the affected target, alone, establishes the maritime nature of this claim. Whether this uncharted area—the parties have led us to no cases involving a TLAM employed at sea—bears a "substantial relationship to traditional maritime activity" is doubtful. The technology described in the pleadings belies the traditional maritime activity of ship bombardment of shore installation. And so does geography. If we chart the world's land-mass within 1,000 miles range from an international body of water, the reach of America's sea-based military power is awesome. To equate maritime jurisdiction with the reach of present or future missile technology would make much of the world "tolerably humid," indeed. Plaintiff expressed a desire to pursue discovery on the accuracy of TLAM's and the potential for mishap. It is not necessary. The circumstances surrounding this particular attack cannot be said to have had a "potentially disruptive impact on maritime commerce."

Based on the text of the Complaint, and the assumption that Plaintiff alleges a taking and not a tort, we find the traditional interests in protecting maritime commerce which give rise to the district court's exclusive jurisdiction are not at issue. Consequently, we reject this second ground for dismissal offered by the Government.

### C. The Fifth Amendment and Foreign–Owned, Foreign–Located Property

◼ Finally, in the last of its initial trio of arguments, the Government asserts the Plaintiffs have no "standing." It claims that the Fifth Amendment does not extend to "takings" of property located outside the United States and owned by non-citizens. The Government is probably correct.

The Takings Clause states simply: "[N]or shall private property be taken for public use, without just compensation." U.S. CONST. Amend. V. This provision does not specifically describe the private property to which it applies or the persons it protects. As a general matter the United States is bound by the Constitution when its activities affect citizens outside of our borders. *See Reid v. Covert,* 354 U.S. 1, 5–6, 77 S.Ct. 1222, 1 L.Ed.2d 1148 (1957).

It is clear that foreign-owned property located within the United States or its territories, *Russian Volunteer Fleet,* 282 U.S. at 491–92, 51 S.Ct. 229, and foreign property owned by United States citizens, *Seery v. United States,* 130 Ct.Cl. 481, 127 F.Supp. 601 (1955), both fall within the ambit of the Takings Clause. However, it is by no means clear whether property neither located in the United States nor owned by one of its citizens is covered by the Fifth Amendment.

The Supreme Court has addressed the extraterritorial application of the Fifth Amendment in a different context in *Johnson v. Eisentrager,* 339 U.S. 763, 70 S.Ct. 936, 94 L.Ed. 1255 (1950). There, aliens imprisoned in Germany following World War II sought *habeas corpus* relief under the Fifth Amendment for their war crimes prosecution by an American Military Commission in China. Although these German nationals were convicted and sentenced under the auspices of the United States, specifically the Secretary of War and various members in the military chain of command, the Supreme Court rejected the proposition that the Constitutional Amendments granting civil rights generally apply to all the world, including enemies of the United States:

> Such extraterritorial application of organic law would have been so significant an innovation in the practice of governments that, if intended or apprehended, it could scarcely have failed to excite contemporary comment. Not one word can be cited. No decision of this Court supports such a view. None of the learned commentators on our Constitution has even hinted at it. The practice of every modern government is opposed to it.

*Id.* at 784–85, 70 S.Ct. 936 (citation omitted). We will revisit *Eisentrager* in a later context because the individuals claiming Constitutional protection were enemies, not merely aliens—a factor we find important.

These expansive and unequivocal statements notwithstanding, only a few years later a decision of the Court of Claims appears to have extended another part of the Fifth Amendment to alien claimants seeking just compensation for the taking of foreign property. This case, *Turney v. United States,*

126 Ct.Cl. 202, 115 F.Supp. 457 (1953), is chiefly relied upon by Plaintiffs in countering the Government's lack of standing argument.

In *Turney,* the United States was charged with a Fifth Amendment takings. It had induced the Philippine government to prohibit the export of certain military surplus property that had been donated to the Philippine government by the United States. The property was subsequently sold to a Philippine corporation. The embargo was necessary to permit the United States government to reclaim the property—classified radar equipment—which it eventually did. The Court found that a taking had occurred, and that just compensation was due. It so held despite the fact that both the location of the property and the owner of the property were foreign. *See Turney,* 126 Ct.Cl. at 215, 115 F.Supp. 457. It also concluded—and this point will be significant in later applications of the case—that the United States involvement in the Philippine government's seizure was sufficiently strong to charge the United States with a taking. *Id.* at 214, 115 F.Supp. 457 ("When we requested that Government to place an embargo upon the exportation of any of the property, it, naturally, readily complied.").

The Court of Claims did not dedicate much attention to the first proposition. It merely recited precedent that had applied the takings doctrine to alien-owned property located in the United States, and to American-owned property abroad. The Court reasoned that because the Takings Clause could be enforced without inconvenience or practical difficulty, it should apply to foreign-owned, foreign-located property. *See Turney,* 126 Ct.Cl. at 215, 115 F.Supp. 457. The short shrift given to the weighty issue does seem somewhat puzzling, especially given the Supreme Court's clear pronouncement in the then-very recent *Eisentrager* case. *Eisentrager,* 339 U.S. at 784–85, 70 S.Ct. 936.

A few years later, in *Seery v. United States,* the Court of Claims acknowledged this reading of *Turney,* albeit in dictum. 130 Ct.Cl. at 481, 127 F.Supp. 601. Mrs. Seery was an American citizen claiming a taking of her property in Austria after World War II. A house and valuable furnishings had been

used and abused by the U.S. Army after the war. The Government objected that the Fifth Amendment did not apply because this property was not located in the United States. The Court rejected that argument:

> We have recently held to the contrary, *Turney v. United States,* 126 Ct.Cl. 202, 215, 115 F.Supp. 457. We recognized that there were no precedents upon the question, but it seemed to us that since the Constitutional provision could be applied, without inconvenience, to such a situation, it ought to be applied. In the *Turney* case, *supra,* the plaintiff was an alien corporation, whereas the instant plaintiff is an American citizen. If that fact is material, it is to her advantage.

*Id.* at 484, 127 F.Supp. 601.

The United States Court of Appeals for the Federal Circuit more recently cited *Turney* with approval in *Langenegger v. United States,* 756 F.2d 1565 (Fed.Cir.1985), *aff'g,* 5 Cl.Ct. 229 (1984), after having recited the facts in that case at length. The Court was not apparently troubled by *Turney's* treatment respecting alien-owned, foreign-sited property. The Court of Appeals quoted the Supreme Court for the test, supplying its own emphasis:

> [I]n any case where government action is causally related to private misconduct which leads to property damage—*a determination must be made whether the government involvement in the deprivation of private property is sufficiently direct and substantial to require compensation under the Fifth Amendment.* 

*Langenegger,* 756 F.2d at 1570 (quoting *Nat'l Bd. of YMCA v. United States,* 395 U.S. 85, 93, 89 S.Ct. 1511, 23 L.Ed.2d 117 (1969)). The Court concluded:

> When considering a possible taking, *the focus is not on the acts of others, but on whether sufficient direct and substantial United States involvement exists.*

*Id.* at 1571.

Thus, we may conclude from these cases that there is no simple rule in the Federal Circuit that excludes foreign-owned, foreign-situated property.

However, a strong note of caution must be voiced—two notes, in fact. First, as we recognized in both *Seery* and *Langenegger,* the plaintiffs were American citizens, and so notwithstanding the affirmative references to *Turney,* the cases do not actually endorse that case's expansive extraterritorial reach of the Fifth Amendment.

Second, *Langenegger* presents an instance in which the interference with property rights was directly effectuated by a foreign government, and the issue was whether the United States Government had enough of a role in prompting that action to be charged as the agency of the interference for Fifth Amendment purposes. The language we have quoted from *Langenegger* must be read as referring to this aspect of *Turney.* In the end, the application of the Takings Clause to the Plaintiffs and their property in our case stands or falls with the precedent of *Turney.*

On a fundamental level, the strength of *Turney* as a precedent for the application of the "takings" clause to foreign-situated, foreign-owned property has been eroded by subsequent Supreme Court decisions. Our colleague, Judge Allegra has analyzed this issue in *Ashkir v. United States,* 46 Fed.Cl. 438 (2000). He concludes that *Turney* no longer has precedential value—an analysis we share—and that it may therefore be disregarded even absent an expression from the Federal Circuit—a conclusion we do not share.

Like *Turney, Ashkir* pertains directly to issues raised in our case. In Judge Allegra's case, a Somali national attempted to invoke our Court's takings jurisdiction when his property in Mogadishu was damaged during United States military operations. The property included a large complex of buildings and other facilities that American forces occupied and used as a headquarters in carrying out a humanitarian mission. The Court ruled that the plaintiff lacked standing to raise the claim because neither he nor his property had a "substantial connection" with the United States. *Ashkir,* 46 Fed.Cl. at 444–45.

In making his ruling, Judge Allegra relied upon recent Supreme Court precedent declining to extend extraterritorially traditional

Fourth Amendment Constitutional protections against unreasonable searches and seizures. Primary among these authorities is *United States v. Verdugo–Urquidez*, 494 U.S. 259, 110 S.Ct. 1056, 108 L.Ed.2d 222 (1990). There a Mexican resident relied upon the Fourth Amendment in seeking to exclude evidence obtained in a warrantless search of his Mexican home by American authorities. The Supreme Court held that the Amendment did not apply under those circumstances. Unlike other cases where we apply Constitutional protections to foreign nationals, the Mexican subject of the search, "ha[d] no previous significant voluntary connection with the United States." *Id.* at 269, 110 S.Ct. 1056.

More to the point, *Verdugo–Urquidez* relied for support on the earlier Supreme Court precedent to which we have previously referred, the *Eisentrager* case, observing that, in that case, the Court had "rejected the claim that aliens are entitled to Fifth Amendment rights outside the sovereign territory of the United States." *Id.* This certainly appears to be the rule where individual due process rights are at stake. For instance, the Court of Appeals for the District of Columbia Circuit recently determined that *habeas* relief is not available to suspected al-Qaeda members detained at the U.S. base in Guantanamo Bay; the Court found that because the base is beyond the territorial jurisdiction of the United States (the base is used pursuant to a lease agreement specifically reserving sovereignty to Cuba) the detainees could not "invoke the jurisdiction of our courts to test the constitutionality or legality of restraints on their liberty." *Al Odah v. United States*, 321 F.3d 1134, 1141 (D.C.Cir. 2003). Neither *Verdugo–Urquidez* nor *Eisentrager* comment specifically on the extraterritoriality of the Takings Clause.

*Ashkir* extends the rationale of those decisions to the takings context. The *Ashkir* case recognized that the "substantial connections" test had rarely been applied in takings jurisprudence. Only one case, *Hoffmann v. United States*, 53 F.Supp.2d 483, 490–91 (D.D.C.1999), relied upon this ground for dismissal. The Federal Circuit explicitly endorsed this ruling by the District Court but, ironically, in an unpublished opinion which, by Circuit rules, is non-precedential. *Hoffmann v. United States*, 17 Fed.Appx. 980, 985 (Fed.Cir.2001); *see also* Fed. Cir. R. 47.6(b) ("An opinion or order which is designated as not to be cited as precedent is one unanimously determined by the panel issuing it as not adding significantly to the body of law.") Judge Allegra reasoned, however, that cases such as *Verdugo–Urquidez* and *Eisentrager* stood for "an overarching construct of the limited territoriality of the Constitution and, in particular, the Bill of Rights ... [which] is equally applicable to the Takings Clause as any other part of the Constitution." *Ashkir*, 46 Fed.Cl. at 443.

We agree with *Ashkir's* implicit conclusion that the authority of *Turney* has been severely undercut. In fact, the Federal Circuit has at least implicitly recognized that the *Turney* case is somewhat of an aberration as respects its second holding on indirect United States action. *See Casa De Cambio Comdiv S.A., De C.V. v. United States*, 291 F.3d 1356, 1362 (2002) ("In only one case, from our predecessor court, *Turney v. United States* (citation omitted), did we find the government's action towards a third-party to have a direct and substantial enough effect on the plaintiff to require compensation under the Takings Clause.").

However, we are loathe to agree that as trial judges we are not bound to follow a clear precedent because its reasoning is deficient or in apparent conflict with other precedent that can—we must be candid—be distinguished. In our precedent-based, common law structure, trial and intermediate courts are bound to follow decisions on the law articulated by superior courts. This simple rule is subject to many qualifications and elaborations, and we resist the invitation to embark on a law review-sized exposition. Suffice it to say that lower courts have many devices to avoid or evade the inconveniences of a troublesome higher court opinion. The *Ashkir* decision, for instance, appears to have simply avoided the impact of *Turney* by classifying it as a case involving a United States plaintiff; of course, this does not alter the fact that the owner of the taken property, as

acknowledged in *Seery,* was, prior to liquidation, a foreign corporation.

We believe that binding decisions must be followed whether they are considered "good law" or "bad law," well reasoned or otherwise. In the event this case is appealed, the Federal Circuit may wish to revisit the *Turney* holding. In the meantime, mindful of that as-yet officially unrepudiated decision, we part company with Judge Allegra and reject this third ground for the Government's Motion to Dismiss.

## D. *The Dimensions of the Takings Clause*

### i. *Takings and Military Action*

■ We have entertained and rejected three arguments for dismissal set forth by the Defendant. We grant the Government's motion for another reason: The Constitutional protection afforded by the Takings Clause is not intended to compensate for destruction of enemy war-making property through the exercise of military force. There is no compensation for property "destroyed as a part of the fortunes of war." *Am. Mfrs. Mut. Ins. Co. v. United States,* 197 Ct.Cl. 99, 101, 453 F.2d 1380 (1972) (no taking occurred where U.S. Army returned fire and sunk naval vessel).

The dimensions of the Fifth Amendment Takings Clause in a military context have been the subject of several court decisions. We conclude from these cases that the clause applies to the civil functions of Government and not to the military. This principle was stated in so many words in the early 19th century case of *Perrin v. United States,* 12 Wall. 315, 79 U.S. 315, 7 Ct.Cl. 223, 20 L.Ed. 412 (1870). Justice Clifford, speaking for the unanimous Court, summarily affirmed the dismissal by the United States Court of Claims. *Id.* That court, predecessor, of course, to our Federal Circuit, and whose decisions are thus binding precedent, discussed the case in more factual and legal detail. We quote the following principle which we believe guides the decision in our case:

No government, except as a special favor bestowed, has ever paid for the property of even its own citizens in its own country destroyed in attacking or defending against a common public enemy; much less is any government bound to pay for the property of neutrals domiciled in the country of its enemy, which its forces may chance to destroy in its operations against such enemy.

*Perrin v. United States,* 4 Ct.Cl. 543, 547–48, 1800 WL 685 (1868).

The same principle was echoed by the Supreme Court in *United States v. Pac. R.R.,* 120 U.S. 227, 7 S.Ct. 490, 30 L.Ed. 634 (1887):

The destruction or injury of private property in battle, or in the bombardment of cities and towns, and in many other ways in the war, had to be borne by the sufferers alone, as one of its consequences. Whatever would embarrass or impede the advance of the enemy, as the breaking up of roads, or the burning of bridges, or would cripple and defeat him, as destroying his means of subsistence, were lawfully ordered by the commanding general. Indeed, it was his imperative duty to direct their destruction. The necessities of the war called for and justified this.

*Id.* at 234, 7 S.Ct. 490.

And the Supreme Court quoted there at length the remarks of President Ulysses Grant, an authority on the use of military power if not the law:

"It is a general principle of both international and municipal law that all property is held subject, not only to be taken by the government for public uses, in which case, under the constitution of the United States, the owner is entitled to just compensation, but also subject to be temporarily occupied, or even actually destroyed, in times of great public danger, and when the public safety demands it; and in this latter case governments do not admit a legal obligation on their part to compensate the owner. The temporary occupation of, injuries to, and destruction of property, caused by actual and necessary military operations, is generally considered to fall within the last-mentioned principle. If a government makes compensation un-

der such circumstances, it is a matter of bounty rather than of strict legal right."

*Id.* at 238, 7 S.Ct. 490 (citations omitted).

This distinction between compensable civil actions and non-compensable military ones is implicit in the so-called "military necessity doctrine." In these cases, civilian property destroyed or expropriated because of the exigencies of military action, falls outside the Fifth Amendment. *See United States v. Russell,* 13 Wall. 623, 80 U.S. 623, 627–28, 20 L.Ed. 474 (1871). The cases explore where the line is drawn between necessary and unnecessary military destruction or appropriation. *See, e.g., United States v. Caltex, Inc.,* 344 U.S. 149, 150–56, 73 S.Ct. 200, 97 L.Ed. 157 (1952) (military necessity justified Army's destruction of oil terminal facilities after attack on Pearl Harbor in order to prevent use by enemy); *Juragua Iron Co. v. United States,* 42 Ct.Cl. 99, 113–14, 1907 WL 886 (1907) (destruction of property necessary to prevent spread of disease among troops), *aff'd,* 212 U.S. 297, 29 S.Ct. 385, 53 L.Ed. 520 (1909). Put another way, they police the boundary between the exercise of the military power and the civil, eminent domain power of the state. However that line may be drawn in a particular case, they all, implicitly or explicitly, state that the Takings Clause does not apply to the destruction of property during combat operations.

### ii. *Takings Jurisprudence and Unauthorized Government Conduct*

■ Before we explore in more detail the tenets of the *Perrin* case, we must return to the Complaint, the President's official statements, and the peculiar principles of takings jurisprudence in this Court.

We recall that the Complaint was founded on the Plaintiffs' contentions that, contrary to the President's assertions, neither the corporation nor the individual Plaintiff was related to terrorism. We quote again for the reader's convenience from the President's first remarks in the early afternoon of August 20, 1998:

Today I ordered our Armed Forces to strike at terrorist-related facilities in Af-

ghanistan and Sudan because of the threat they present to our national security.

\* \* \* \* \* \*

The United States launched an attack this morning on one of the most active terrorist bases in the world.... We also struck a chemical weapons-related facility in Sudan. Our target was the terrorists' base of operation and infrastructure. Our objective was to damage their capacity to strike at Americans and other innocent people.

2 PUBLIC PAPERS OF THE PRESIDENT, WILLIAM J. CLINTON 1460 (1998).

The President then went on to explain the four reasons why he took this action:

[F]irst, because we have convincing evidence these groups played the key role in the Embassy bombings in Kenya and Tanzania; second, because these groups have executed terrorist attacks against Americans in the past; third, because we have compelling information that they were planning additional terrorist attacks against our citizens and others with the inevitable collateral casualties we saw so tragically in Africa; and fourth, because they are seeking to acquire chemical weapons and other dangerous weapons.

*Id.*

The President followed these remarks with a formal statement from the Oval Office later in the day. In it, he described the targets as enemy-related facilities that posed an "imminent threat" to national security. He described the Sudan target as a factory "associated" with bin Laden producing "materials for chemical weapons." We quote again selected portions of the President's Address to the Nation on Military Action Against Terrorist Sites in Afghanistan and Sudan:

Our target was terror; our mission was clear: to strike at the network of radical groups affiliated with and funded by Usama bin Ladin, perhaps the preeminent organizer and financier of international terrorism in the world today.

\* \* \* \* \* \*

I decided America must act. And so this morning, based on the unanimous recommendation of my national security team, I

ordered our Armed Forces to take action to counter an immediate threat from the bin Ladin network.

Earlier today the United States carried out simultaneous strikes against terrorist facilities and infrastructure in Afghanistan.

\* \* \* \* \* \*

Our forces also attacked a factory in Sudan associated with the bin Ladin network. The factory was involved in the production of materials for chemical weapons.

*Id.* at 1460–61.

The Complaint does not challenge the President's authority as Commander in Chief to take military actions to defend the Country and its citizens. Rather, the Complaint contradicts the factual premises upon which these justifications rest. For example, paragraph 20 denies that the plant had chemical weapons facilities; paragraph 26 claims that "[t]here was no factual warrant for the destruction of the plant"; paragraph 29 alleges "[n]one of the government's explanations for its actions in destroying the plant has any merit"; and in paragraphs 30 through 81, and in the remaining factual allegations, paragraphs 82 through 89, the Plaintiffs articulate a detailed rebuttal to the official and unofficial Government justifications. Finally, the Complaint explicitly contradicts the President's justification, if not his authority, for the destruction of Plaintiffs' property:

There is no basis, reasonable or otherwise, for the uncompensated destruction of the Plant either as a chemical weapons facility, as a facility connected to terrorism, or otherwise as a danger to the health and safety of American citizens or allies.

Compl. ¶ 93.

Besides its detailed rebuttal of the official and unofficial justifications, the Complaint makes none-too-subtle an allegation that the attacks were a "Wag the Dog" exercise. The strikes, it is alleged, were ordered to distract America from a breaking scandal involving the President's affair with a White House intern. Compl. ¶ 29.

It is a cardinal rule of Takings jurisprudence that the legitimacy or authority of the Government's action must be conceded in takings proceedings before this Court. *See*

*Florida Rock Indus. v. United States,* 791 F.2d 893, 898–99 (Fed.Cir.1986), *on remand,* 21 Cl.Ct. 161 (1990); *see generally,* Jed M. Silversmith, *Takings, Torts & Turmoil: Reviewing the Authority Requirement of the Just Compensation Clause,* 19 UCLA J. ENVTL. L. & POL'Y 359 (2001–02). The place to challenge the authority of the conduct is elsewhere, presumably the District Court in ordinary cases. Although from time to time counsel for the Plaintiffs in the hearings and written papers reasserted the Plaintiffs' factual challenge to the Government's claims of justification, when pressed they admitted, as they must, that for purposes of a takings case, the destruction was authorized, if mistaken.

What is the authority asserted for this action? It is the President's power to defend the Nation by military means against threats of attack by enemy forces; in this case, a threat of attack by chemical weapons from a terrorist group. As our extensive quotation of the President's statements demonstrates, the President took these actions "pursuant to [his] constitutional authority to conduct U.S. foreign relations and as Commander in Chief and Chief Executive." 2 PUBLIC PAPERS OF THE PRESIDENT, WILLIAM J. CLINTON 1464 (1998); *see also* U.S. CONST., Art. II., Sec. 2[1]. Thus, for purposes of assessing the Government's motion to dismiss, the question becomes: Does the Fifth Amendment provide compensation for the purposeful destruction of an enemy instrument of war? The question answers itself. And, despite the excellence of the Plaintiffs' advocacy, they have not offered a contrary answer.

In our case, we are not dealing with deliberate or accidental destruction by military means of property conceded to be private. Such cases fall within the Court's jurisdiction because the Government interference with the private property would presumably be compensable under ordinary circumstances. These are traditional "military necessity" cases. Ours is also not a case of collateral damage to private property from military action. Neither is it an instance where the Armed Forces must seize, occupy or destroy private property in furtherance of a military objective.

Although the Government in its last briefing claims "military necessity," we do not understand it to be conceding that the property was private, nor is it conceding the Court's role to assess the Government's claims of military necessity. Although its language is obscure at several points, we take the Government's claim to be that the President's duty, as Commander in Chief, of securing national self-defense, takes the case out of the eminent domain context. We are dealing with the destruction by military means of asserted enemy property to protect the nation because the President determined this combat operation was necessary.

The property involved is not just enemy property by virtue of its location in hostile territory. *See, e.g., Juragua,* 42 Ct.Cl. at 111–12 (American corporation's property located in Cuba treated as "enemy property"). In our instance, the property is an asserted enemy weapons factory. Our case might just as well involve the destruction by military force of a tank factory, or of a tank, itself. Reduced to its essentials, the President targeted an enemy military facility. The Plaintiffs' challenge that targeting decision as erroneous.

But in opposing what they argue is the "Government's sweeping expansion of the military necessity doctrine"—an issue we do not have to reach—Plaintiffs' counsel makes some key admissions on the appropriate scope of the Takings Clause, in general. We quote at length from the Plaintiffs' papers:

> [B]ecause enemy property is subject to confiscation, the Takings Clause does not apply to attacks on enemy property, and it would therefore be inapplicable to any property destroyed within areas under the control of the Taliban. For the same reason, no takings claim could arise out of the destruction of property in any country that *actually* belongs to an enemy of the United States, such as Usama bin Ladin or Al Qaeda ... *Finally, no matter who owns property that is illegal (such as chemical weaponry), the destruction of such property does not implicate the Takings Clause because such property is subject to government confiscation and destruction.*

Pls.' Opp'n to Def.'s Mot. to Dismiss Based on the Doctrines of Military Necessity and Public Necessity (Pls.Opp.Mil.Nec.) at 25–26 (emphasis added) (citations omitted).

While we may quibble with the Plaintiffs' phraseology, we agree with their restatement of the law. Their entire case rests on their use of the word "actually" and its implications. Thus, the Plaintiffs follow this statement of the law with a description of their case and why it falls outside their restatement:

> In short, this case represents an unusual, if not *sui generis,* situation, in which private property owned by a person who is not an enemy of the United States in a country at peace with the United States is purposefully destroyed in a military operation.

Pls. Opp. Mil. Nec. at 26.

This is demonstrably incorrect as a statement of the law. A number of cases—*Perrin* among them—have considered the enemy status of property when the owner was presumably not an actual enemy. *See, e.g., "The Prize Cases,"* 67 U.S. 635, 2 Black 635, 17 L.Ed. 459 (1862); *Thirty Hogsheads of Sugar v. Boyle,* 9 Cranch 191, 13 U.S. 191, 195–97, 3 L.Ed. 701 (1815); *Seery,* 130 Ct.Cl. at 487, 127 F.Supp. 601. In these cases, the "enemy" nature of the property was its situs in what was, or was not, enemy territory or, for blockade purposes, its port of origin. Therein is the nub of the issue. For once we recognize that the challenged Government action is an exercise of military power, not civil eminent domain, the matter falls outside the Fifth Amendment and beyond this Court's jurisdiction. As the Supreme Court has recognized, the Takings Clause "is no comprehensive promise that the United States will make whole all who suffer from every ravage and burden of war." *Caltex,* 344 U.S. at 156, 73 S.Ct. 200 (destruction of plaintiff's petroleum facilities was necessary to deprive enemy of a strategic logistic weapon).

Challenges to the exercise of the President's authority to use military force in defending the country must lie in some other forum than this. On a motion to dismiss, we assume as true the allegations contained within Plaintiffs' Complaint. But if we do so

here, the Plaintiffs' Complaint is self-defeating. First, the allegations strip the Complaint of the threshold requirements for a valid takings cause of action. Second, even if we were to assume jurisdiction, the allegations set up a nonjusticiable debate on the propriety of the President's use of force for national security. When the Court pressed the parties for briefing on the political question doctrine, Plaintiff claimed that it did not apply to the questions before the Court: "Because takings claims simply seek just compensation and do not challenge the validity of government conduct, they raise quintessentially judicial questions." Pls.' Suppl. Mem. of Law Addressing the Political Question Doctrine at 3. But we can not reconcile this accurate statement of the law with the allegations within the Complaint.

The Government goes a little further. It supplies the following reasons why the Plaintiffs must accept as true the official justification offered by the President. First, the Court must accept the President's statements as true because to dispute them involves a political question beyond the competence of the Court. Second, El–Shifa challenges "the fact-finding, reasoning, motives and judgment behind the President's order," a challenge not permitted in "takings litigation." Reply Mem. in Supp. of Def.'s Mot. to Dismiss Based on the Political Question Doctrine and the Doctrine of Necessity at 8. Third, the President's decision was based on his discretionary authority as Commander in Chief, and the exercise of executive discretion is not subject to judicial second-guessing, absent abuse. Fourth, because the United States challenges the jurisdictional assertions of the Plaintiffs, the Court need not accept as true the Plaintiffs' factual allegations. In this instance, however, the Court must accept as true the President's factual findings that underlie his action.

While the Government may well be correct on any or all of these points, a simpler answer lies in what we have already said. Questioning the authority for the action admittedly lies outside the Fifth Amendment and thus this Court's jurisdiction. In any context, even a tort action, the Plaintiffs face obstacles in a challenge to the exercise of discretionary authority, especially in a military operational context. *See Gen. Dynamics Corp. v. United States*, 139 F.3d 1280, 1283 (9th Cir.1998) ("discretionary function exception" of Federal Tort Claims Act jurisdictional); *see also Johnson v. United States*, 170 F.2d 767, 770 (9th Cir.1948) (addressing "combatant activities exception" to Federal Tort Claims Act). But it is simply not cognizable in this Court. Whether any court can consider the Plaintiffs' challenge, we leave for resolution in the District Court case.

### iii. *The Perrin Case*

We now turn to a closer examination of the *Perrin* case, an early case that distinguishes between the civil power of eminent domain comprehended by the Fifth Amendment, and the exercise of military power which falls outside it. Allowing for the differences of scale from 150 years of history, the facts and circumstances of this case are strikingly similar to our own.

Although the Supreme Court opinion is succinct and relatively barren, we get a full explanation of the factual setting of the case from the U.S. Court of Claims opinion and even more from President Pierce's Message to Congress of December 4, 1854, relied upon by the Court to state the doctrine we must now follow. The latter is attached as an Appendix to this decision for the history buff.

The case was brought by Marie Louise Perrin, who in 1854 was a French citizen, but who had become a naturalized American citizen by the time suit was filed. Early in 1854, she and her husband had shipped valuable merchandise to the town of San Juan, Nicaragua, also known as Greytown. There it was warehoused. On July 13, 1854, by order of the President of the United States, the town was bombarded by a United States naval vessel, the man-of-war Cyane, under Commander Hollins, and all the plaintiff's goods were destroyed with the rest of the town.

Greytown was a transit point for overland travel between the Atlantic and Pacific. With the cession of California to the United States and the discovery of gold, "the passage across Central America had become of

great importance to the U.S." *Perrin,* 4 Ct. Cl. at 546. It was not, however, a safe passage: "Greytown had become the resort of desperate and reckless adventurers, who took pleasure in despoiling the citizens of the United States and insulting her flag and authority." *Id.*

The United States initially insisted that Nicaragua pacify the town, a demand clearly beyond the reach of that government. The President then dispatched the Cyane to the scene. Commander Hollins demanded reparations and apologies, which were not forthcoming. After giving neutrals an opportunity to remove their property, a dispensation the Perrins failed to avail themselves of, he opened fire. The opinion relates the consequences in matter-of-fact terms:

> A large portion of the place was battered down by the guns of the ship, and then a party was sent on shore to apply the torch, and complete by burning what had escaped the bombardment. The town was totally destroyed.

*Id.* at 547.

Commander Hollins made a full report to the Secretary of Navy and the President, who reported to the Congress, and the Commander was commended "for the prompt and efficient manner in which he had carried out the instructions of his government." *Id.*

Like our Plaintiffs, Mrs. Perrin's resort to the U.S. Court of Claims followed her unsuccessful appeals to other forums, in her case the French government, Congress, and the Executive Branch. And, like our Plaintiffs, she based her claim on a takings theory: Because of the clause of the Constitution of the United States which provides that "private property shall not be taken for public use except on just compensation." *Id.* at 544.

We quote again the conclusion of the Court:

> No government, except as a special favor bestowed, has ever paid for the property of even its own citizens in its own country destroyed in attacking or defending against a common public enemy; much less is any government bound to pay for the property of neutrals domiciled in the

country of its enemy, which its forces may chance to destroy in its operations against such enemy.

*Id.* at 547-48.

The Court recognized that Mrs. Perrin's claim, like that here, was founded on a challenge to the legitimacy of the government's action:

> The claimant's case must necessarily rest upon the assumption that the bombardment and destruction of Greytown was illegal and not justified by the law of nations. And hinging upon that, it will be readily seen that the questions raised are such as can only be determined between the United States and the governments whose citizens it is alleged have been injured by the injurious acts of this government. They are international political questions, which no court of this country in a case of this kind is authorized or empowered to decide.

*Id.* at 547.

The concluding rationale of the *Perrin* decision, however, takes us in another direction. It is that citizens, Americans or others, with property in foreign countries are left to recourse against that foreign government for any injuries to their property caused by the "belligerent acts committed against that place by another foreign nation," even if the belligerent acts are committed by the United States, notwithstanding the Fifth Amendment. *See id.* at 548-49 (adopting the statements of Secretary of State Seward and Lord Palmerston regarding the responsibilities stemming from the attack of Greytown).

What are we to make of the *Perrin* case? It offers a number of conclusions pertinent to our circumstances:

- The military action was not directed at the state of Nicaragua, with whom we presumably were at peace, but at individuals, not officially associated with a governmental entity, taking concerted action against our citizens and property.

- Hostilities, if not warfare, existed as a consequence of the attacks on United States citizens and property; the situation "called for prompt and decided action on the part of the United States." *Id.* at 546.

- The resulting use of force—destroying the town by shelling and torching the entire town—was directed purposefully at what was regarded as enemy property.
- Some of the "enemy" property destroyed was allegedly private property owned not by any enemy, but by an innocent party.
- The claimant, although at time of suit an American, was at the time of her injury a French citizen—she had applied unsuccessfully to that government to intercede for compensation with the United States. Citizen or not, she had no recourse in this American court.
- As an American, she bore the misfortunes of war in a foreign place, even when her own government was the cause.
- Claims for injuries for violations of international law are political questions to be decided between governments.
- In sum, notwithstanding her American citizenship or the location of her property, Mrs. Perrin bore the consequences of deliberate military action purposefully committed against that property.

Thus, the *Perrin* case, never overruled, qualified, or distinguished, would seem to end the matter. And we think it does, with one minor but exceedingly troublesome caveat. Is the Plaintiff barred from challenging in Court the President's designation of the property as an enemy weapons facility? And perhaps even more important to the individual plaintiff, Mr. Idris, can he challenge in this Court the President's implicit public designation of him as an accomplice of Osama bin Laden. While not by any means minimizing the significance of the $50 million claim for the destroyed factory, Mr. Idris may understandably value his reputation even more.

#### iv. *Enemy Property*

Earlier we alluded to the importance of a precedent such as *Eisentrager* in this case. That case stands for the obvious proposition that an enemy at war with our country may not seek the protections of our Constitution. We recognize that the case has been interpreted even more broadly as precluding Constitutional rights to aliens outside our sover-

eign territory, regardless of whether they are enemy aliens. *See Al Odah,* 321 F.3d at 1145; *Hoffmann,* 53 F.Supp.2d at 490. However, we do not have to extend the principle that far.

The case for the air strike against El–Shifa has been played out in the court of public opinion. Commentators have reflected on the President's legal basis for the attack and the intelligence community's role in supporting the decision. *See* Ruth Wedgwood, *Responding to Terrorism: The Strikes Against Bin Laden,* 24 YALE J. INT'L L. 559 (1999) for a comprehensive review of the evidentiary basis for the air strikes against El–Shifa and the terrorist targets in Afghanistan. Still other commentators have speculated that the purported reasons for the attack were not the real reasons—the "Wag The Dog" theory which has even made its way into this Complaint. Those controversies are beyond the scope of the issues that we can review. *See Langenegger,* 756 F.2d at 1569 ("If the 'purported' reasons for action are not the real reasons, we think the matter is not one the judicial bench can correct; a subjective determination of a government's motive is beyond judicial inquiry.") Our inquiry here is limited to the legal consequences of the President's justifications for attack, not the factual underpinning for his justification.

The Plaintiffs do not dispute the consequences for Fifth Amendment compensation of designating property as "enemy property." But they can point to precedent in which the courts have reviewed these Government claims, sometimes rejecting them. The "military necessity" cases are one obvious example. Some of those cases went to trial on disputed facts. Indeed, some cases involved disputes over the "enemy property" designation. *See, e.g., Young v. United States,* 97 U.S. 39, 60, 24 L.Ed. 992 (1877); *"The Prize Cases,"* 67 U.S. at 635, 17 L.Ed. 459 (1862); *Thirty Hogsheads of Sugar,* 13 U.S. at 195–97; *Juragua,* 42 Ct.Cl. at 111–12; *Seery,* 130 Ct.Cl. at 484, 127 F.Supp. 601. In *Seery,* the Court rejected outright the Government's claim, finding that Austria was not "enemy territory" following the surrender of Germany. 130 Ct.Cl. at 487–88, 127 F.Supp. 601. These cases seem to hold that while giving

great deference to the Government's claim that the property falls outside the Fifth Amendment, the judicial deference was not total.

We conclude, however, that our case is different. As we have repeatedly noted, the property here was not private property destroyed in the course of military activity, or even private property transformed into enemy property by virtue of its physical location or the allegiance of its owners. The property was designated by the Commander in Chief as enemy war-making property—what we can term "public enemy" property. Based upon intelligence and advice from his national security advisors—faulty or not, we have neither the means nor the authority to determine—the President categorized El-Shifa as an imminent threat to our national security. 2 PUBLIC PAPERS OF THE PRESIDENT, WILLIAM J. CLINTON 1460–62 (1998). With their citation of what they describe as instances of official back-pedaling, Plaintiffs have gone a long way in demonstrating that the designation of El-Shifa as a chemical weapons plant associated with terrorism may have been tragically inaccurate. But notwithstanding the aftermath of the President's decision, for purposes of this lawsuit, we must defer to the President's designation.

A second essential difference is that the action allegedly constituting a taking was the direct application of military force against a military target or, more accurately, a civilian target that was transformed into a lawful military target by the war-making activities of the President. The fact that Sudan, as a nation state, was not at war with the United States is not determinative of the issue. Terrorism crosses national borders, even our own. If that was not clear in 1998 after a number of terrorist incidents directed at American citizens, it is certainly abundantly clear now. Federal courts in three Circuits have just recently handed down decisions, as judges continue to grapple with the legal status and available rights of individuals detained as suspects in the War on Terror. *See Al Odah,* 321 F.3d 1134; *Padilla ex rel. Newman v. Bush,* 233 F.Supp.2d 564 (S.D.N.Y.2002), *adh'd to on reconsideration, sub nom., Padilla ex rel. Newman v. Rums-*

*feld,* 243 F.Supp.2d 42 (S.D.N.Y.2003); and *Hamdi v. Rumsfeld,* 316 F.3d 450 (4th Cir. 2003). However, it is agreed that "a formal declaration of war is not necessary in order for the executive to exercise its constitutional authority to prosecute an armed conflict—particularly when, as on September 11, the United States is attacked." *Padilla,* 233 F.Supp.2d at 589. In justifying the strike against El-Shifa and the other target in Afghanistan, President Clinton declared: "Afghanistan and Sudan have been warned for years to stop harboring and supporting these terrorist groups. But countries that persistently host terrorists have no right to be safe havens." Address to the Nation, 2 PUBLIC PAPERS OF THE PRESIDENT, WILLIAM J. CLINTON 1461 (1998).

The *Prize Cases,* 67 U.S. 635, 2 Black 635, 17 L.Ed. 459 (1862), recognize that the President's declaration of a blockade—of the Confederate ports—is an act of war which is conclusive of the question of whether a state of war exists, whether or not war is formally declared by Congress. *Id.,* 67 U.S. at 668. The court saw no difference between the nature of that war—between nations, or between a nation and insurgents. Similarly, we are not bound by formality here. *See United States v. Rockwood,* 48 M.J. 501, 508 n. 14 (Army Ct.Crim.App.1998) ("when courts have decided whether 'time of war' exists for various purposes, they have generally looked to both the fact of actual hostilities and the recognition of such a state, not necessarily through a declaration of war, by the executive and legislative branches.") (citations omitted).

And we do not regard a war against a non-state, non-insurgent group—stateless terrorists—to be any less a war. *See, generally,* Jeffrey F. Addicott, *Legal and Policy Implications for a New Era: The "War on Terror,"* 4 SCHOLAR 209, 209–225 (2002). Certainly the terrorist attacks that have followed, if not preceded, the 1998 embassy bombings—the 1996 bombing of the military barracks at Khobar Towers, Saudi Arabia, the 2000 suicide attack on the U.S.S. Cole in Yemen, and most tragic and violent of all, the attacks on our own soil of the Pentagon, the World Trade Center, and in Pennsylva-

nia—are sufficient to confirm the President's assertion that a state of war exists between the United States and those same terrorists determined to have been operating a weapons-related factory in Khartoum. *See id.* at 240 n. 183.

This is not a new proposition—military action against the Greytown's quasi-political enemy and President Jefferson's military force against the Barbary Pirates on the shores of Tripoli are other historical examples of military force against loosely organized non-state enemies. And it follows that as the President as Commander in Chief can conclusively designate by his actions a state of war, so he can also designate as Commander in Chief the identity of the enemy targets for the purposes of applying military force or engaging in combat activities. As one commentator has correctly observed: "Since the al-Qaeda fighters belong to a terrorist organization and are not recognized members of an armed force they are unlawful belligerents under the law of war. This means they are responsible for breaches of the law of war but are not entitled to Prisoner of War Status." *See id.* at 239 (footnotes omitted); *see also Padilla,* 233 F.Supp.2d at 592–94 (Court discusses legal consequences of President designating plaintiff an "enemy combatant.").

### v. *Deference and the President's War Powers*

Our view that the Court is bound by the President's designation of the El–Shifa plant as a chemical weapons facility under the control of Osama bin Laden is not based solely on 19th century cases. Recently the United States Court of Appeals for the Fourth Circuit held the same in an analogous, and even more troublesome case, *Hamdi v. Rumsfeld,* 316 F.3d 450 (4th Cir.2003) (*Hamdi III* ). That Court upheld an official designation that Mr. Hamdi, an American detained in relation to the most recent terrorist attacks of September 11, 2001, was an "enemy combatant." The declaration was made by a "Special Advisor to the Under Secretary of Defense for Policy." The court expressly prohibited the trial court from looking behind that declaration.

At stake was a *habeas corpus* challenge to Mr. Hamdi's military detention and denial of other basic due process rights of his American citizenship, rights which might generally be acknowledged as more fundamental than compensation for lost property. And the declaration was by a Special Advisor to a sub-Cabinet office, not the official, formal statement of the President, as in our case.

In this third appeal in the *Hamdi* litigation, the Court described the issue and its resolution as follows:

> The district court certified for appeal the question of whether a declaration by a Special Advisor to the Under Secretary of Defense for Policy setting forth what the government contends were the circumstances of Hamdi's capture was sufficient by itself to justify his detention. Because it is undisputed that Hamdi was captured in a zone of active combat in a foreign theater of conflict, we hold that the submitted declaration is a sufficient basis upon which to conclude that the Commander in Chief has constitutionally detained Hamdi pursuant to the war powers entrusted to him by the United States Constitution. No further factual inquiry is necessary or proper, and we remand the case with directions to dismiss the petition.

*Id.* at 459.

Mr. Hamdi's petition for a writ acknowledged only that he was seized in Afghanistan by the Northern Alliance and transferred to United States custody. *Id.* at 460. The petition does not concede that Mr. Hamdi bore arms against the Northern Alliance or the United States, or that he was a member of al-Qaeda. Among other forms of relief, he sought an evidentiary hearing to resolve any facts disputed by the Government. *Id.* Thus, in this respect the Hamdi proceedings and our own are similar. Both parties seek to put the United States to proof of its allegation of the parties' enemy status.

In a prior review, the Court of Appeals directed the trial court to conduct a limited and deferential inquiry into whether Mr. Hamdi was indeed an enemy combatant. *See Hamdi v. Rumsfeld,* 296 F.3d 278, 283 (4th Cir.2002) (*Hamdi II* ). On further appeal,

the Court of Appeals was loathe to treat precipitously the "complex and serious national security issues" on the one hand, or on the other, quoting its earlier ruling, "to embrace the sweeping proposition in that, with no meaningful judicial review, any American citizen alleged to be an enemy combatant could be detained indefinitely without charges or counsel on the government's sayso." *Hamdi III*, 316 F.3d at 460–61 (citation omitted).

The trial court held the required hearing, expressing its concern with a "war" of such an indefinite character against an enemy of such uncertain and open-ended description. *See id.* Ordered to respond to the petition, the Government moved to dismiss and submitted an affidavit of the Special Advisor admitting all the allegations of the petition, including the fact that Mr. Hamdi had been designated an "enemy combatant." The affidavit also asserted the facts and circumstance that led to the conclusion that Mr. Hamdi was an enemy combatant. *Id.*

The trial court, however, questioned the sufficiency of the affidavit, its candor and completeness, and the standing of the affiant. It issued an opinion concluding that the affidavit was insufficient to support the detention. *See id.* at 462. It ordered the Government to turn over a considerable amount of information about Mr. Hamdi and his activities, in effect, discovery of evidence supporting the "enemy" label. This is the equivalent of El–Shifa's demand that the Government substantiate the allegations in the President's statements justifying his decision to destroy the plant. On the Government's request, the Court certified the question of whether the affidavit was sufficient as a matter of law to support judicial review of the "enemy combatant" designation. *Id.*

Reviewing the President's power as Commander in Chief to wage war, the Court of Appeals mentioned at least three particulars of that power—the authority to detain those captured, to deport or detain enemy aliens, and to confiscate or *destroy enemy property. Id.* at 463 (emphasis added) (citations omitted).

The court went on to describe the limited and deferential role of courts as respects matters arising under the war powers allocated by the Constitution to Congress and the President. That deference is founded not only on the particular expertise and organizational capacity of the Executive and Legislative Branches, but also on the political responsiveness of the other branches. *Id.* We might say that, in other words, matters relating to exercise of war-making powers are the most fundamental of "political questions." On the other hand, there is no textual role for the judiciary in the war-making function:

> For the judicial branch to trespass upon the exercise of the war-making power would be an infringement of the right to self-determination and self-governance at a time when the care of the common defense is most critical.

*Id.; see also Johnson v. Eisentrager*, 339 U.S. at 789, 70 S.Ct. 936 ("[I]t is not the function of the Judiciary to entertain private litigation ... which challenges the legality, wisdom, or the propriety of the Commander in Chief in sending our armed forces abroad or to any particular region."); *Rockwood*, 48 M.J. at 507 ("On matters concerning military operations, courts should defer to the judgments and actions of the president and commanders in the field, at least in the absence of overwhelming facts to the contrary.").

At the same time, the judiciary has an essential role to play in protecting the rights of citizens—and to some extent, non-citizens—even where the war-making power collides with those rights. *Hamdi III*, 316 F.3d at 464–65. Unfortunately, courts are not nearly as vigilant during times of crisis as they are on later reflection. *See generally Korematsu v. United States*, 323 U.S. 214, 65 S.Ct. 193, 89 L.Ed. 194 (1944) (upheld exclusion of persons of Japanese ancestry from certain areas during World War II emergency action); *Hirabayashi v. United States*, 320 U.S. 81, 102, 63 S.Ct. 1375, 87 L.Ed. 1774 (1943) (upheld curfews for Japanese–Americans according only intermediate Constitutional scrutiny); *see also* Civil Liberties Act of 1988, 50 U.S.C. app. § 1989a(a) (1994) ("The Congress recognizes that ... a grave injustice was done to both citizens and permanent resident aliens of Japanese ancestry

by the evacuation, relocation, and internment of civilians during World War II . . . .").

The right to due process and the right to compensation for property takings are, of course, guaranteed in the same Constitutional amendment. Aside from the matter of citizenship, this case and Mr. Hamdi's detention are parallel in this respect—the identification of each with terrorism. In both cases, we are dealing with the core of the President's war-making responsibilities: The designation of an enemy combatant and of an enemy military target "bear the closest imaginable connection to the President's constitutional responsibilities during the actual conduct of hostilities." *Hamdi III*, 316 F.3d at 466. We thus conclude that the right to compensation for a taking under the Fifth Amendment does not extend to the destruction of property designated by the President as enemy war-making property, and that the Court may not look behind the President's discharge of his Constitutional duties as Commander in Chief, including his declaration of what constitutes an enemy target and his determination to use military force to destroy that target.

### CONCLUSION

Mr. Idris, through his Complaint and his counsel in oral argument, has strenuously denied any connection with terrorism. On a personal level, we see no reason not to accept these protestations at face value. However, for the purposes of this litigation at this time, we are compelled to accept the contrary declaration of the President.

The Constitution's guarantee of just compensation for a Government taking of private property was intended to "bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be bourne by the public as a whole." *Langenegger*, 756 F.2d at 1570 (quoting *Armstrong v. United States*, 364 U.S. 40, 80 S.Ct. 1563, 4 L.Ed.2d 1554 (1960)). That rationale does not apply in these circumstances. No authority has been presented, among the large body of takings precedent during military operations, where the enemy target of military force was able to invoke the Takings Clause. And for good reason. As the Supreme Court has indicated, "[i]t would be difficult to devise more effective fettering of a field commander than to allow the very enemies he is ordered to reduce to submission to call him to account in his own civil courts and divert his efforts and attention from the military offensive abroad to the legal defensive at home." *Eisentrager*, 339 U.S. at 779, 70 S.Ct. 936.

**For the reasons stated above, we GRANT the Defendant's Motion to Dismiss.** The Clerk of Court is directed to enter judgment for the Defendant. Each party to bear its own costs.

**IT IS SO ORDERED.**