EL–SHIFA PHARMACEUTICAL IN-
DUSTRIES COMPANY and Salah El
Din Ahmed Mohammed Idris, Plain-
tiffs–Appellants,

v.

UNITED STATES, Defendant–Appellee.

No. 03–5098.

United States Court of Appeals,
Federal Circuit.

Aug. 11, 2004.

Stephen J. Brogan, Jones Day, of Washington, DC, argued for plaintiffs-appellants. With him on the brief were Timothy J. Finn, Jonathan C. Rose, Daniel H. Bromberg and Julia C. Ambrose. Of counsel was Christopher J. Lovrien.

Peter H. Oppenheimer, Attorney, Environment & Natural Resources Division, Policy, Legislation & Special Litigation Section, United States Department of Justice, of Washington, DC, argued for defendant-appellee. With him on the brief were Thomas L. Sansonetti, Assistant Attorney General; and Kathryn E. Kovacs, Attorney.

Before LOURIE, CLEVENGER, and SCHALL, Circuit Judges.

CLEVENGER, Circuit Judge.

El–Shifa Pharmaceutical Industries Company ("El–Shifa") and Salah El Din Ahmed Mohammed Idris ("Idris") (collectively "appellants") brought this suit seeking just compensation for the destruction of a manufacturing facility by the armed forces of the United States. The complaint alleges that destruction of the appellants' facility constituted a taking of private property for public use within the

meaning of the Fifth Amendment to the United States Constitution. The Court of Federal Claims concluded that the government's conduct did not rise to the level of a taking under the Fifth Amendment and dismissed the complaint accordingly. *El–Shifa Pharm. Indus. Co. v. United States*, 55 Fed. Cl. 751 (2003). For the reasons stated below, we hold that the appellants failed to allege a valid takings claim and therefore affirm the judgment of the Court of Federal Claims.

## I

The complaint states that Idris is a highly successful Saudi banker who was born and raised in Sudan. The chain of events leading up to the instant lawsuit began in March 1998, when Idris purchased shares in El–Shifa, a corporation organized under the laws of Sudan, for $18 million. At the time, El–Shifa was the sole and exclusive owner of a manufacturing facility located in Khartoum, Sudan ("the Plant"). The appellants allege that El–Shifa was the largest pharmaceutical manufacturing company in Sudan and that it used the Plant to supply drugs sorely needed by the impoverished people living in that country.

On August 7, 1998, the United States Embassies in Nairobi, Kenya, and Dar es Salaam, Tanzania, were bombed in nearly simultaneous attacks that were linked to Osama bin Ladin and the terrorist organization al-Qaeda. On August 20, 1998, President William Jefferson Clinton ordered the armed forces of the United States to conduct strikes in Afghanistan and Sudan intended to "disrupt bin Ladin's terrorist network and destroy elements of its infrastructure" there. President's Radio Address, 2 *Pub. Papers* (Aug. 22, 1998). In particular, the stated purpose of the strikes was to "destroy, in Sudan, [a] factory with which bin Ladin's network is associated, which was producing an ingredient essential for nerve gas." *Id.*

The day after the strikes, the President sent a letter to Congress in which he stated that the Plant was being used to produce chemical weapons. *See* Letter to Congressional Leaders Reporting on Military Action Against Terrorist Sites in Afghanistan and Sudan, 2 *Pub. Papers* (Aug. 21, 1998). The President stated the United States had acted in self-defense, and that the

strikes were a necessary and proportionate response to the imminent threat of further terrorist attacks against U.S. personnel and facilities. These strikes were intended to prevent and deter additional attacks by a clearly identified terrorist threat. The targets were selected because they served to facilitate directly the efforts of terrorists specifically identified with attacks on U.S. personnel and facilities and posed a continuing threat to U.S. lives.

*Id.* The President added that he ordered the strikes "pursuant to [his] constitutional authority to conduct U.S. foreign relations and as Commander and Chief Executive." *Id.* Although bin Laden and al-Qaeda survived the strikes, the Plant was "substantially, if not completely, destroyed." *El–Shifa*, 55 Fed. Cl. at 754. The appellants aver that the Plant was destroyed by cruise missiles launched from American naval vessels operating on the high seas.

The appellants filed a complaint in the Court of Federal Claims on July 27, 2000, seeking $50 million in damages as compensation for the destruction of the Plant by the United States. The complaint contained a series of factual allegations denying assertions President Clinton and members of his administration made regarding the Plant's involvement in the production of chemical weapons as well as links between the appellants and al-Qaeda.

The government responded with a motion to dismiss the complaint challenging

the appellants' standing to sue as well as the jurisdiction of the Court of Federal Claims to entertain their takings claim. The government argued first, that the appellants' complaint should be dismissed because nonresident aliens do not have standing to sue the government for an alleged taking absent a substantial voluntary connection between the United States and the claimants or their property. Second, the government characterized any injury the appellants may have suffered during the strikes as a maritime tort over which the Court of Federal Claims lacked subject matter jurisdiction. Third, the government argued that the appellants failed to satisfy the specific requirements of 28 U.S.C. § 2502, which limits the jurisdiction of the Court of Federal Claims over suits brought by aliens to those in which United States citizens enjoy a reciprocal right to sue the alien's home nation in its home courts.

After oral argument on the government's motion, the court ordered the parties to file additional briefing addressing the justiciability of the appellants' claim in light of the Supreme Court's political question doctrine and the applicability of the Takings Clause of the Fifth Amendment to the governmental conduct described in the complaint. *El–Shifa*, 55 Fed. Cl. at 755. Ultimately, the government briefed fully its contention that the political question and military necessity doctrines counseled in favor of dismissal. *Id.*

The Court of Federal Claims rejected the three original grounds for dismissal, but nevertheless ruled in the government's favor on the ground that the Takings Clause did not apply to the facts alleged in the complaint. *See id.* at 755–56 (stating that "the Takings Clause does not extend to claims arising out of military operations against enemy war-making instrumentalities"). The court determined that the property in question in this case was transformed into enemy property by the President, *see id.* at 771, and it determined that the President's designation was conclusive in light of his constitutional role as Commander–in–Chief, *see id.* at 772. The court concluded that it could "not look behind the President's discharge of his Constitutional duties as Commander in Chief, including his declaration of what constitutes an enemy target and his determination to use military force to destroy that target." *Id.* at 774.

The Court of Federal Claims entered judgment in the government's favor on March 14, 2003 and denied the appellants' motion for reconsideration. The appellants timely appealed the court's decision to this court. We have jurisdiction to entertain the appeal pursuant to 28 U.S.C. § 1295(a)(3).

## II

■ The appellants' assertion that the Court of Federal Claims erred when it dismissed their complaint for failing to state a claim upon which relief can be granted raises a question of law that we review *de novo*. *See Leider v. United States*, 301 F.3d 1290, 1295 (Fed.Cir.2002); *Boyle v. United States*, 200 F.3d 1369, 1372 (Fed.Cir.2000). In reviewing a decision to dismiss for failure to state a claim we must assume that all the well-pled factual allegations in the appellants' complaint are true, and we draw all reasonable inferences in their favor. *See Leider*, 301 F.3d at 1295. The government's contention that the Court of Federal Claims erred when it rejected its motion to dismiss for lack of subject matter jurisdiction also raises a question of law warranting *de novo* review. *See Boyle*, 200 F.3d at 1372; *Moyer v. United States*, 190 F.3d 1314, 1317–18 (Fed.Cir.1999).

## III

On appeal, the government raises anew its three original grounds for dismissal of the appellants' complaint. Like the Court of Federal Claims, we think none of these grounds provides a firm basis supporting entry of judgment in favor of the United States.

## A

The government's first ground raises the issue of whether the Takings Clause reaches property owned by a nonresident alien located beyond the shores of the United States. The government argues that it does not if the nonresident alien or his property lacks a substantial voluntary connection to the United States. The appellants oppose the government's characterization of the Takings Clause in this respect and respond by stating, in part, that the "Takings Clause imposes an absolute and unqualified restriction upon government conduct . . . [that] is derived from a theory of 'natural law' and based upon a natural right to private property which is universal in nature, not dependent on citizenship, and a fundamental principle of international law. . . ." Appellants' Reply Br. at 20.

The Takings Clause tersely states: "nor shall private property be taken for public use, without just compensation." U.S. Const. amend. V. To be sure, the text of the Takings Clause does not qualify what is meant by "private property" or indicate that it must be located in this country. Nor does the text say that only American citizens may receive just compensation. Accordingly, the parties agree that a complaint does not have to allege that the government has appropriated property physically located in the United States in order to state a valid takings claim. *See Turney v. United States,* 126 Ct.Cl. 202, 115 F.Supp. 457, 464–65 (1953) (rejecting argument that Takings Clause

did not apply to property located in a foreign country); *Seery v. United States,* 130 Ct.Cl. 481, 127 F.Supp. 601, 602–03 (1955) (rejecting government's argument that takings claims should be dismissed because private property at issue was located in Austria). They also agree that a claimant does not necessarily have to aver that he is a United States citizen or resident alien in order to make out a valid takings claim if his property is located in the United States. *See Russian Volunteer Fleet v. United States,* 282 U.S. 481, 491–92, 51 S.Ct. 229, 75 L.Ed. 473 (1931) (holding Takings Clause reached the claim of nonresident alien friend whose property the government seized when it was located in the United States).

The parties disagree, however, over the legal implication of the particular facts of the instant case, where the claimant is a nonresident alien lacking substantial voluntary connection to this country *and* the allegedly taken property was situated on foreign soil. In the government's view, this combination sounds the death knell for the appellants' claim. The government relies on the Supreme Court's decision in *United States v. Verdugo–Urquidez,* 494 U.S. 259, 274–75, 110 S.Ct. 1056, 108 L.Ed.2d 222 (1990), where the Court held that the Fourth Amendment did not apply to the warrantless search of a Mexican citizen's home in Mexico in connection with a criminal investigation. The petitioner in *Verdugo–Urquidez* argued that the Fourth Amendment's prohibition on unreasonable searches applied to and prohibited the search because the Court had in the past held that nonresident aliens enjoy certain rights under the Constitution. *Id.* at 270–71, 110 S.Ct. 1056. Among these rights was the right to just compensation for property taken by the United States. *Id.* at 271, 110 S.Ct. 1056 (citing *Russian Volunteer Fleet,* 282 U.S. 481, 51 S.Ct. 229, 75 L.Ed. 473). The Court rejected this argument and stated that:

These cases, however, establish only that aliens receive constitutional protections when they have come within the territory of the United States and developed substantial connections with the country.... Respondent is an alien who has had no previous significant voluntary connection with the United States, so these cases avail him not.

*Id.* (citations omitted).

The appellants respond with authority from our predecessor court, *Turney v. United States,* in which the court held that the seizure by the United States of radar equipment located in the Philippines, owned at the time by a Philippine corporation, constituted a taking for which just compensation was owed. *Turney,* 115 F.Supp. at 463–64. Although the *Turney* court did not specifically inquire into the substantial connections of the corporation or its property to the United States, it did reject the government's argument that the Takings Clause lacked extraterritorial application.[1] *Id.* at 464. Nevertheless, in the appellants' view, *Turney* binds us, and it stands for the proposition that the Takings Clause protects the property interests of nonresident aliens located abroad even where there is no demonstrable connection between them or their property and the United States.

The parties present us, on the one hand, with *Turney,* which counsels in favor of extending the protections of the Takings Clause to the appellants without regard to the absence of allegations of substantial voluntary connections to the United States in their complaint. On the other hand, we are offered a reading of Supreme Court precedent that purportedly overrules *Turney* and instead suggests that the appellants would have to establish stronger vol-

untary connections to this country before they would be entitled to benefit from the protections its Constitution provides. When presented with this same choice, the Court of Federal Claims determined that the *Verdugo–Urquidez* Court extended the substantial connections test to the Takings Clause of the Fifth Amendment, but that it was nevertheless bound by the doctrine of *stare decisis* to follow the rule of *Turney.* See *El–Shifa,* 55 Fed. Cl. at 764. Indeed, the court invited us to overrule *Turney* if we agreed with its reading of *Verdugo–Urquidez.*

■ We are hesitant to accept this invitation to the extent that it asks us to expressly overrule *Turney.* "We cannot simply overrule the [*Turney* ] decision, even if we were persuaded ... that it is appropriate; to overrule a precedent, the court must rule en banc." *George E. Warren Corp. v. United States,* 341 F.3d 1348, 1351 (Fed.Cir.2003) (citing *Newell Cos. v. Kenney Mfg. Co.,* 864 F.2d 757, 765 (Fed. Cir.1988)). Moreover, because we think the appellants' takings claim at bottom presents a nonjusticiable political question, we are not required to explore whether *Turney* enjoys any continuing vitality after *Verdugo–Urquidez* in order to affirm the decision on appeal. Accordingly we decline to hold, as the government asks, that the Takings Clause does not protect the interests of nonresident aliens whose property is located in a foreign country unless they can demonstrate substantial voluntary connections to the United States.

B

■ We find the government's second original ground for dismissal to be without merit. In their complaint, the appellants include a number of allegations disputing

---

1. We note, only in passing, that the court's opinion indicates that the allegedly taken radar equipment once belonged to the United States and that the Philippine corporation was closely held by a small group of shareholders that included two former members of the United States Air Force. *See Turney,* 115 F.Supp. at 458–59.

the accuracy of the President's determination that, *inter alia*, the appellants were using the Plant to produce chemical weapons ingredients for al-Qaeda. The government argues that the appellants' claim is, at its core, that the President acted negligently when he designated the Plant for destruction, and that any theory of recovery based on this conduct necessarily sounds in tort. Therefore, the government concludes, the appellants' claim cannot be within the jurisdiction of the Court of Federal Claims. *See* 28 U.S.C. § 1491(a)(1) (divesting Court of Federal Claims of jurisdiction in cases sounding in tort). The government asserts further that the alleged tortious behavior is maritime in character because it involved the launch of cruise missiles from vessels at sea, and therefore, jurisdiction over the appellants' claim lies properly with the federal district courts. *See* 28 U.S.C. § 1333(1) (2000) (granting exclusive and original jurisdiction to federal district courts over civil cases in admiralty and maritime jurisdiction).

Although the complaint does recite a series of allegations contradicting the purported links between Idris, the Plant, and international terrorism, we read it to ask the Court of Federal Claims to remedy a taking, not a tort. Granted, these allegations, if true, would impugn the President's characterization of the Plant as a chemical weapons factory. The United States may, or may not, have acted negligently in targeting the Plant for destruction. However, this was not for the Court of Federal Claims to decide, nor is it for us. That the complaint suggests the United States may

have acted tortiously towards the appellants does not remove it from the jurisdiction of the Court of Federal Claims. To the contrary:

> If the government appropriates property without paying just compensation, a plaintiff may sue in the Court of Federal Claims on a takings claim regardless of whether the government's conduct leading to the taking was wrongful, and regardless of whether the plaintiff could have challenged the government's conduct as wrongful in another forum.

*Del–Rio Drilling Programs, Inc. v. United States*, 146 F.3d 1358, 1363 (Fed.Cir.1998); *see also Rith Energy, Inc. v. United States*, 247 F.3d 1355, 1365 (Fed.Cir.2001) ("[A] takings claim lies, as long as the government's action was authorized, even if the government's action was subject to legal challenge on some other ground.").

■■■ As we have explained, an allegation that the government has taken property in a legally improper manner states "two separate wrongs [that] give rise to two separate causes of action." *Rith Energy*, 247 F.3d at 1365 (quoting *Del–Rio Drilling*, 146 F.3d at 1364) (alteration in original). Under such circumstances, the plaintiff "is free either to sue in district court for asserted improprieties committed in the course of the challenged action or to sue for an uncompensated taking in the Court of Federal Claims." *Id.* (citing *Del–Rio Drilling*, 146 F.3d at 1364). The appellants have indeed filed an administrative claim and a lawsuit in federal district court (filed on April 4, 2001) based on the same allegations found in the instant complaint.[2] *See El–Shifa*, 55 Fed. Cl. at 754.

---

**2.** Ever mindful of this court's duty to attend to its own jurisdiction, *see Morgan v. Principi*, 327 F.3d 1357, 1363 (Fed.Cir.2003), we consider whether the appellants' later filing in federal district court ousted the Court of Federal Claims of jurisdiction over their takings claim under 28 U.S.C. § 1500 ("section 1500"). Section 1500 states, in pertinent

part, that: "The United States Court of Federal Claims shall not have jurisdiction of any claim for or in respect to which the plaintiff or his assignee has pending in any other court any suit or process against the United States...." We determine "whether another claim is 'pending' for purposes of § 1500 ...

With this in mind, it is understandable why the Court of Federal Claims stated that the appellants had filed a "multipurpose" complaint. *Id.* The multipurpose nature of the complaint did not deprive the Court of Federal Claims of jurisdiction to entertain the takings claim alleged therein.[3]

We also reject the government's argument concerning the implication that the maritime nature of the government's conduct has for jurisdiction in the Court of Federal Claims. Given that the appellants state a claim for takings, the government's argument boils down to nothing more than assertion that a takings claim with maritime overtones must necessarily fall within the maritime jurisdiction of the federal district courts. This argument lacks merit. A taking consummated at sea is nevertheless a taking. As such, the Court of Federal Claims is the proper forum in which such cases are to be adjudicated. The appellants' allegation that the United States used its Navy to launch projectiles that destroyed their Plant does not divest the Court of Federal Claims of jurisdiction to entertain their takings claim.

### C

■■■ The government's third original ground for dismissal is its weakest. Section 2502 of Title 28 states that:

> Citizens or subjects of any foreign government which accords to citizens of the United States the right to prosecute claims against their government in its courts may sue the United States in the United States Court of Federal Claims if the subject matter of the suit is otherwise within such court's jurisdiction.

28 U.S.C. § 2502 (2000). Section 2502, known as the Reciprocity Act, burdens alien plaintiffs who invoke the process of the Court of Federal Claims with showing that their home courts treat natives and American citizens equally when they adjudicate claims brought against their home countries. *See Ferreiro v. United States.,* 350 F.3d 1318, 1322 (Fed.Cir.2003) ("Equal treatment is the paramount requirement of the Reciprocity Act.").

The appellants met this burden in the proceedings before the Court of Federal Claims. They introduced evidence tending to show that in law, and in practice, American citizens may sue the Sudanese government on equal terms with Sudanese citizens. Based on this evidence, the Court of Federal Claims concluded that the "Constitution of the Republic of the Sudan guarantees for all persons the right to prosecute claims against the government." *El–Shifa,* 55 Fed. Cl. at 756. The thrust of the government's evidence in support of its motion to dismiss suggested that the Sudanese courts have lost their independence and are beholden to Islamic religious law. *Id.* As such, the government

---

at the time at which the suit in the Court of Federal Claims is filed[.]" *Loveladies Harbor, Inc. v. United States,* 27 F.3d 1545, 1548 (Fed. Cir.1994) (*en banc*). Accordingly, the appellants did not vitiate the jurisdiction of the Court of Federal Claims over their first complaint by later filing the same claim in federal district court. *See Tecon Eng'rs, Inc. v. United States,* 170 Ct.Cl. 389, 343 F.2d 943, 946 (1965) (rejecting argument that plaintiff ousted Court of Claims of jurisdiction by later filing the same suit in federal district court); *see also Hardwick Bros. Co. v. United States,* 72 F.3d 883, 886 (Fed.Cir.1995) (confirming that the *Tecon Engineers* exception to section 1500 is still good law); *Dico, Inc. v. United States,* 48 F.3d 1199, 1203 (Fed.Cir.1995) (same); *Loveladies Harbor,* 27 F.3d at 1549 (same).

3. Because we conclude that the appellants' complaint states a takings claim falling within the jurisdiction of the Court of Federal Claims, we need not address the government's argument that the Supreme Court's tests for finding federal district court jurisdiction over maritime torts have been satisfied in this case. *See* Br. of Appellee at 45–53.

asserted, they are instruments of discrimination against non-Muslims. *Id.*

The Court of Federal Claims was correct to require a greater showing from the government in order to defeat the appellants' *prima facie* showing of reciprocity. *See id.* at 758. Although the government's evidence suggested that pro-Muslim political elements probably wield undue influence on the courts of Sudan, we have recently held that "political interference alone on the part of the foreign sovereign will not serve to defeat a claim of reciprocity." *Ferreiro,* 350 F.3d at 1325. Moreover, there was no evidence in the record that the non-Muslim Sudanese were any better off than non-Muslim Americans in Sudanese courts. Such evidence was necessary if the government's arguments regarding the influence of Muslim law on the Sudanese courts were to have any probative value on the issue of reciprocity.

On appeal, the government argues that blanket provisions of the Sudanese constitution guaranteeing to all people equal treatment before and equal access to the Sudanese courts were suspended in 1999, and therefore, the appearance of reciprocity in the appellants' evidence is likely illusory. Even if this disputed fact, which apparently was not before the Court of Federal Claims, were true, we think it would bolster rather than undermine a finding of reciprocity. As blanket provisions that apply to "all people," the legal consequences of their repeal would apparently apply equally to Sudanese as well as American citizens. The government does not contend that the provisions were repealed only insofar as they had previously applied to American citizens. We think such evidence would be critical if repeal of these provisions were to evince disparate treatment adverse to American citizens tending to undermine the appellants' reciprocity allegation. *See id.* at 1322 ("[T]he Reciprocity Act 'contemplates only that

American citizens enjoy an equal standing with foreigners in actions against the foreign State' and does not require the existence of an action against the foreign state of identical nature or scope." (quoting *Nippon Hodo Co. v. United States,* 152 Ct.Cl. 190, 285 F.2d 766, 767–68 (1961))).

## IV

Having disposed of the government's three original arguments in favor of dismissal, we now consider its contention that the Takings Clause does not reach the class of Executive conduct that led to the destruction of the Plant.

### A

The appellants do not contend, nor could they, that the Takings Clause can be successfully invoked against all military conduct that results in the appropriation or destruction of private property. Rather, they concede at the very outset of their argument to this court that the "just compensation requirement does not apply to 'enemy property.'" Appellants' Opening Br. at 2. In its opinion, the Court of Federal Claims noted that the appellants admitted the same in the proceedings before it and that they stated further that "no takings claim could arise out of the destruction of property in any country that *actually* belongs to an enemy of the United States...." *El–Shifa,* 55 Fed. Cl. at 767. That the United States does not have to answer under the Takings Clause for the destruction of enemy property or, as the Court of Federal Claims termed it, "enemy war-making instrumentalities," is to us a concept so manifest that it hardly requires further elaboration. A contrary rule that, by way of example, would require the government to provide compensation for the destruction of a vehicle (a tank, jet, etc.) used to engage United States armed forces

in battle, strikes us as absurd in the extreme.

■ However, it is equally true that the government does not avoid the Takings Clause by simply using its military forces as cover for activities that would otherwise be actionable if performed by one of its civilian agencies. Military conduct that does not touch on the destruction or appropriation of enemy property can sometimes give rise to a valid takings claim. *See, e.g., Argent v. United States,* 124 F.3d 1277, 1281–85 (Fed.Cir.1997) (holding that a private property owner may state a valid taking claim arising from military aircraft overflights). In such cases, the military merely carries out the sovereign's eminent domain prerogative which, under our Constitution, the United States may not exercise without providing just compensation.

■ Thus, military takings cases often ask courts to ascertain the precise point at which the military conduct complained of is no longer coextensive with the state's civil power of eminent domain, but rather, enters the zone of conduct, outside the reach of the Takings Clause, where the United States appropriates the property of its enemies. *Cf. Nat'l Bd. of YMCAs v. United States,* 184 Ct.Cl. 427, 396 F.2d 467, 470 (1968) ("It is axiomatic that the fifth amendment is not suspended in wartime, but it is equally well recognized that a destruction of private property in battle or by enemy forces is not compensable."). In order to decide whether the facts of any particular military takings case paint a picture cognizable as a compensable taking under the Fifth Amendment, courts have

> look[ed] to the general principles announced in the decisional law to find the narrow and sometimes indistinct line that separates losses that are necessary

incidents of the ravages and burdens of war from those situations where the Government is obliged to pay compensation to the owner of private property that is taken for public use.

*Id.* at 471.

The decision of the Court of Claims in *Perrin v. United States,* 4 Ct.Cl. 543 (1868), *aff'd* 12 Wall. 315, 79 U.S. 315, 316, 7 Ct.Cl. 223, 20 L.Ed. 412 (1870), is a seminal case in that decisional law. While the phrase "enemy property" seems to have its origins as a term of art for prize courts,[4] *Perrin* was the first case in which the outlines of an enemy property doctrine applicable to takings jurisprudence can be recognized. The facts of *Perrin* concerned the destruction of private property that resulted from the razing of the city of Greytown, Nicaragua, on July 13, 1854, by a United States naval vessel. *Id.* at 546–47. With the discovery of gold in California, safe passage from the Eastern States to that territory through Central America became a matter of strategic importance for the United States. *Id.* at 546. The court's opinion in *Perrin* suggests that the trip through Greytown was a hazardous one. The property of American citizens traveling to California was frequently taken and destroyed by townspeople, often with the support and at the behest of the local government. *Id.*

The diplomatic efforts of the United States to put an end to these disruptions were to no avail. An appeal to the national government of Nicaragua and the dispatch of an emissary to Greytown failed to end the attacks. *Id.* Consequently, the President decided to send the Cyane, a sloop of war commanded by one Hollins, to press the nation's grievances. *Id.* Commander Hollins delivered an ultimatum demanding recompense for the taken proper-

---

4. *See The Prize Cases,* 67 U.S. (2 Black) 635, 674, 17 L.Ed. 459 (1862) (stating "enemies' property" is "a technical phrase peculiar to prize courts . . .").

ty and an apology on pain of attack. *Id.* at 546–47. The ultimatum went unheeded, and Commander Hollins ordered Greytown destroyed. The operation was a complete success. *Id.* at 547.

The Greytown affair resulted in the destruction of valuable merchandise owned by the Perrins, neither of whom were personally hostile to the United States. *Id.* at 546. They sued the United States in the Court of Claims for the value of the merchandise under a theory of takings. The court observed initially that:

> No government, except as a special favor bestowed, has ever paid for the property of even its own citizens in its own country destroyed in attacking or defending against a common public enemy; much less is any government bound to pay for the property of neutrals domiciled in the country of its enemy, which its forces may chance to destroy in its operations against such enemy.

*Id.* at 547–48. As for non-hostile claimants such as the Perrins, whose only offense was to have physically located their property within the shores of enemy territory, the court held:

> [O]ne who takes up a residence in a foreign place and there suffers an injury to his property by reason of belligerent acts committed against that place by another foreign nation, must abide the chances of the country in which he chose to reside; and his only claim, if any, is a personal one against the government of that country in which his own sovereign will not interest himself.

*Id.* at 548. Accordingly, the court dismissed the Perrins' complaint as their property was located in Greytown, a foreign place hostile to the United States, and it was therefore rightly designated as enemy property subject to destruction. *See Juragua Iron Co. v. United States*, 212 U.S. 297, 305–06, 29 S.Ct. 385, 53 L.Ed. 520 (1909) (finding no compensable taking

where government destroyed suspected source of infectious disease located on enemy soil); *Seery*, 127 F.Supp. at 605–06 (rejecting government's enemy property defense because property belonging to military takings claimant was actually located in friendly territory when it was taken).

The Supreme Court applied enemy property doctrine to a number of military takings cases that followed *Perrin*. *United States v. Pacific Railroad Co.*, 120 U.S. 227, 228–31, 7 S.Ct. 490, 30 L.Ed. 634 (1887), concerned the destruction of a number of bridges by Union forces operating in Missouri during the Civil War. The claimant, Pacific Railroad Company, provided certain transportation services to the government during the war for a fee that had remained unpaid since the cessation of hostilities. *Id.* at 228, 7 S.Ct. 490. The railroad brought a lawsuit against the United States to recover the fee. *Id.*

Also during the war, Union forces determined they could impede the advance of the Confederate Army through the area if they destroyed several of the railroad's bridges. *Id.* at 229., 7 S.Ct. 490 The military destroyed a number of bridges, and thereafter it repaired all of them except four. *Id.* The Court's opinion suggests that what bridges the military repaired, it did so in order to facilitate the advance of its own forces throughout the theater of operations. *Id.* at 231–32, 7 S.Ct. 490. In responding to the railroad's demand, the government argued that the trial court should have offset any monies it may have owed the railroad by an amount equal to the cost of these repairs. *Id.* at 229, 232, 7 S.Ct. 490.

The Court reversed the decision of the Court of Claims granting the offset. *Id.* at 240, 7 S.Ct. 490. In so doing, the Court addressed the nature and scope of the parties' obligations to each other that may have arisen from their conduct during the

war. The Court concluded that the railroad had no obligation to offset the government's debt. In its view:

[P]rivate parties cannot be charged for works constructed on their lands by the government to further the operations of its armies. Military necessity will justify the destruction of property, but will not compel private parties to erect on their own lands works needed by the government, or to pay for such works when erected by the government.

*Id.* at 239, 7 S.Ct. 490. The government was to bear alone the burden of constructing the roads and bridges it needed to move troops and supplies. *Id.* Granting its request for an offset would be tantamount to impermissibly placing on the railroad that portion of the burden of moving troops through the battlefield represented by the government's bridge reconstruction costs.

The Court also addressed, at length, the existence of any obligation of the government to the railroad under the Takings Clause. *Id.* at 233–39, 7 S.Ct. 490. It relied on the enemy property doctrine to conclude that the railroad could not hold the government liable in takings for the destruction of any of its bridges. In the Court's view, a state of war unquestionably existed in Missouri at the time Union forces destroyed the railroad's bridges—a war in which:

More than a million of men were in the armies on each side. The injury and destruction of private property caused by their operations, and by measures necessary for their safety and efficiency, were almost beyond calculation. For all injuries and destruction which followed necessarily from these causes no compensation could be claimed from the government. By the well-settled doctrines of public law it was not responsible for them. The destruction or injury of private property in battle, or in the

bombardment of cities and towns, and in many other ways in the war, had to be borne by the sufferers alone, as one of its consequences. Whatever would embarrass or impede the advance of the enemy, as the breaking up of roads, or the burning of bridges, or would cripple and defeat him, as destroying his means of subsistence, were lawfully ordered by the commanding general. Indeed, it was his imperative duty to direct their destruction.

*Id.* at 233–34, 7 S.Ct. 490. Although, as the Court observed, individuals over the years had petitioned Congress for compensation for the loss of property suffered at the hands of the military under similar circumstances, that body had never granted any such claim. *Id.* at 235–39, 7 S.Ct. 490. Indeed, by the time *Pacific Railroad* was decided, "[t]he principle that, for injuries to or destruction of private property in necessary military operations during the civil war, the government is not responsible[, was] established." *Id.* at 239, 7 S.Ct. 490.

However settled the doctrine may have been, it was not boundless. Rather, the *Pacific Railroad* Court explained instead that the government could not use the enemy property doctrine to shield itself from takings liability when:

[P]roperty of loyal citizens is taken for the service of our armies, such as vessels, steamboats, and the like, for the transport of troops and munitions of war or buildings to be used as store-house [sic] and places of deposit of war material, or to house soldiers or take care of the sick, or claims for supplies seized and appropriated. In such cases, it has been the practice of the government to make compensation for the property taken.

*Id.* at 239, 7 S.Ct. 490; *see also United States v. Russell,* 80 U.S. (13 Wall.) 623,

629, 20 L.Ed. 474 (1871) (holding that the United States owed private takings claimant just compensation for requisitioning three steamboats to ferry Union soldiers during Civil War). In such cases, the military acted pursuant to the state's power of eminent domain, and the government could justifiably be charged with paying just compensation as a result.[5]

To be sure, the Court's exegesis, which distinguished between the military's civil functions (requiring just compensation) and its war-making functions (which the enemy property doctrine immunized from takings liability) was not strictly necessary to answer the precise question presented, i.e., whether the law obligated the railroad to reimburse the government for reconstructing four of its destroyed bridges. However, nearly seventy years later, the Court confirmed that the *Pacific Railroad* Court's discussion of the enemy property doctrine was in fact the law of the land. *See United States v. Caltex (Phil.), Inc.,* 344 U.S. 149, 154, 73 S.Ct. 200, 97 L.Ed. 157 (1952) ("[W]hether or not the principle laid down by Mr. Justice Field [in *Pacific Railroad* ] was dictum when he enunciated it, we hold that it is law today.").

*Caltex* presented the Court with a military takings claim brought by three oil companies that owned oil terminal facilities in the Philippines when Pearl Harbor was attacked on December 7, 1941. *Id.* at 150, 73 S.Ct. 200. After the attack, and in advance of the Japanese invasion of Manila, United States forces determined that it was necessary to destroy the companies' facilities as well as the oil stored therein so that they might not fall into enemy hands. *Id.* at 150–51, 73 S.Ct. 200. The Army carried out the destruction of the property as the Japanese were entering the city, thereby depriving them of a "valuable logistic weapon." *Id.* at 151, 73 S.Ct. 200.

The companies relied on two Civil War era cases to support their argument that the government ought to pay them just compensation as a consequence. The first, *Mitchell v. Harmony,* 54 U.S. (13 How.) 115, 14 L.Ed. 75 (1852), presented a military takings claim arising from the Mexican and American War. During that war, it was the government's policy to permit merchants to follow the military into Mexican territory to trade with the inhabitants residing there. *Id.* at 132–33. It was thought this would "conciliate" the Mexican provinces and thereby "weaken the power of the hostile government of Mexico, with which we were at war." *Id.* at 133. Plaintiff Harmony was a trader who followed the United States forces as they moved into New Mexico. At one point, Harmony was forced to follow against his will, and ultimately, the military used his wagons and mules in the battle of Sacramento and in a subsequent march deeper into Mexican territory. *Id.* at 128–30. In-

---

5. The Court has in the past relied alternatively on a theory of implied contract to find compensable takings, especially in those cases where "property of loyal citizens is taken for the service of our armies." *See Pac. R.R.,* 120 U.S. at 239, 7 S.Ct. 490 (stating that the obligation to pay just compensation in such cases is "supposed to rest upon the general principle of justice that compensation should be made where private property is taken for public use," but nevertheless, the military's seizure and appropriation of property in these instances "may not be within the terms of the constitutional clause"); *Russell,* 80 U.S. (13 Wall.) at 630 (explaining that government's obligation to pay for use of steamboats to ferry troops was founded upon implied promise to compensate their owner for the services he rendered); *see also Nat'l Bd. of YMCAs,* 396 F.2d at 471, 396 F.2d 467 (discussing *Russell* and other cases where courts have found compensable military takings and suggesting that "the property in those cases was requisitioned in a manner much akin to the procurement of goods and services under contract—in the absence of immediate danger, after deliberation, and for a somewhat later and less temporary use").

deed, the Court noted that the military had taken Harmony's property for no other reason than to "insure the success of [this] distant and hazardous expedition." *Id.* at 135. Under such circumstances, the Court held that the law did not permit the military to use Harmony's property without paying just compensation. *Id.* at 136. The Court determined further that the same result would obtain even if the military had appropriated Harmony's property in order to prevent it from falling into the hands of the enemy. In that regard, the Court stated that, "[t]here are, without doubt, occasions in which private property may lawfully be taken possession of or destroyed to prevent it from falling into the hands of the public enemy.... Unquestionably, in such cases the government is bound to make full compensation to the owner[.]" *Id.* at 134.

The second case, *United States v. Russell,* held that the government was bound to compensate a takings claimant whose steamboats the military impressed in order to ferry Union troops during the Civil War. *Russell,* 80 U.S. (13 Wall.) at 628–29, 632. In language that was noted in *Caltex, see* 344 U.S. at 152–53, 73 S.Ct. 200 n.3, the *Russell* Court suggested that in all cases where the government is shown to have taken private property "in time of war or immediate and impending public danger," "the government is bound to make full compensation to the owner[,]" *see Russell,* 80 U.S. (13 Wall.) at 628 n. 6 (relying on *Mitchell,* 54 U.S. (13 How.) at 134).

The *Caltex* Court rejected the oil companies' arguments based on *Mitchell* and *Russell* and held the government was not liable to them for the value of the destroyed oil storage facilities. *Caltex,* 344 U.S. at 154–56, 73 S.Ct. 200. The Court determined that the language in those cases lending support to their takings claim was in fact "far broader than the[ir]

holdings," and that both cases had only required the Court to adjudicate takings claims concerning "equipment which had been impressed by the Army for subsequent use by the Army." *Id.* at 152–53, 73 S.Ct. 200. In neither case did the military "destroy[ ] property of strategic value to prevent the enemy from using it to wage war the more successfully." *Id.* at 153, 73 S.Ct. 200. Rather, the property at issue in *Caltex* was enemy property subject to destruction by the government under the doctrine set forth in *Pacific Railroad. Id.* at 154, 156, 73 S.Ct. 200. As the Court explained,

> The short of the matter is that this property, due to the fortunes of war, had become a potential weapon of great significance to the invader. It was destroyed, not appropriated for subsequent use. It was destroyed that the United States might better and sooner destroy the enemy. The terse language of the Fifth Amendment is no comprehensive promise that the United States will make whole all who suffer from every ravage and burden of war. This Court has long recognized that in wartime many losses must be attributed solely to the fortunes of war, and not to the sovereign.

*Id.* at 155–56, 73 S.Ct. 200 (footnote and citations omitted).

The role of the judiciary in much of our precedent in the area of military takings, including the cases we discussed above, has been to draw a "thin line ... between sovereign immunity and governmental liability." *Nat'l Bd. of YMCAs,* 396 F.2d at 472. The instant case is unique however in military takings jurisprudence, in that we are not asked to determine on which side of that line the governmental conduct at issue falls. Indeed, under our precedent, if it were actually true in 1998, as the government then maintained, that the na-

tion's terrorist enemies were using the Plant to manufacture chemical weapons destined for use against American citizens and interests around the globe, then the appellants' property loss would be subsumed by the enemy property doctrine, and that would be the end of it. Accordingly, today, we need not further sharpen the line that separates private property lost to the "fortunes of war" from that the military takes pursuant to the state's power of eminent domain.

This case asks us to draw a line of a different sort. The complaint filed by the appellants challenges the government's designation of the Plant as enemy property by, *inter alia,* suggesting that the President relied on flawed intelligence in targeting it for destruction. It is replete with allegations contradicting the government's, indeed the President's, determination that the Plant was part of Osama bin Laden's array of weapons deployed against Americans at home and abroad. For the reasons set forth more fully below, we think the power set forth in Article III, section 1 of the Constitution does not encompass judicial supervision over the President's designation as enemy property the private property belonging to aliens located outside the territory of the United States.

## B

■ Without question, "it is emphatically the province and duty of the judicial department to say what the law is." *Marbury v. Madison,* 5 U.S. (1 Cranch) 137, 177, 2 L.Ed. 60 (1803). "Sometimes, however, the law is that the judicial department has no business entertaining [a] claim of unlawfulness—because the question is entrusted to one of the political branches or involves no judicially enforceable rights. Such questions are said to be 'nonjusticiable' or 'political questions.'" *Vieth v. Jubelirer,* — U.S. —, —, 124 S.Ct. 1769, 1776, 158 L.Ed.2d 546 (2004) (citations omitted).

In *Baker v. Carr,* 369 U.S. 186, 217, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962), the Supreme Court set forth six tests for the presence of a nonjusticiable political question:

■ a textually demonstrable constitutional commitment of the issue to a coordinate political department; or [2] a lack of judicially discoverable and manageable standards for resolving it; or [3] the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or [4] the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of the government; or [5] an unusual need for unquestioning adherence to a political decision already made; or [6] the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

*See also Nixon v. United States,* 506 U.S. 224, 228–36, 113 S.Ct. 732, 122 L.Ed.2d 1 (1993) (finding in the Constitution a textual commitment of impeachment proceedings to the Senate and House of Representatives); *United States v. Munoz–Flores,* 495 U.S. 385, 389–96, 110 S.Ct. 1964, 109 L.Ed.2d 384 (1990) (holding adjudication of Origination Clause challenges by the federal courts do not evince lack of respect due political branches of government or lack any judicially manageable standards); *Davis v. Bandemer,* 478 U.S. 109, 106 S.Ct. 2797, 92 L.Ed.2d 85 (1986) (concluding political gerrymandering claims are susceptible to resolution with a judicially discoverable and manageable standard), *questioned in Vieth,* — U.S. at — —, 124 S.Ct. at 1776–92 (discussing reasons for plurality's desire to overrule *Davis* ). Recently, the Court indicated that the *Baker* Court "probably listed [the six tests] in descending order of both importance and certainty." *Vieth,* — U.S. at —, 124 S.Ct. at 1776.

■ The decision that a question is nonjusticiable is not one courts should make lightly. Although each *Baker* test is independent, *id.*, we must satisfy ourselves that at least one of the six *Baker* tests is inextricably present in the facts and circumstances in this case before we may conclude that it presents a nonjusticiable political question, *Baker*, 396 U.S. at 217, 90 S.Ct. 347. This is so because courts should not use the political question doctrine to avoid deciding cases with political overtones or questions that they might categorize simply as "political." *See id.* (calling for discriminating inquiry and admonishing "semantic cataloguing" in political question cases). Over the appellants' arguments to the contrary, we conclude that the facts and circumstances of this case satisfy the first *Baker* test for the presence of a nonjusticiable political question.

C

The "issue" presented here, for purposes of deciding whether there is "a textually demonstrable commitment of the issue to a coordinate political department," is the inherent power *vel non* of the President to designate as enemy property the private property of an alien that is situated on foreign soil. Whatever inherent power the President may have to make such designations must emanate from the Constitution. *See Ex parte Quirin*, 317 U.S. 1, 25–26, 63 S.Ct. 1, 87 L.Ed. 3 (1942) ("Congress and the President, like the courts possess no power not derived from the Constitution."). The Constitution grants to the President the "executive Power," *see* U.S. Const. art. II, § 1, cl. 1, and requires that he "take Care that the Laws be faithfully executed," *id.*, art. II, § 3. The President is "Commander in Chief of the Army and Navy of the United States, and of the Militia of the several States, when called into actual Service of the United States." *Id.*, art. II, § 2, cl. 1.

The appellants take these passages of the Constitution at face value and find lacking in them a "textually demonstrable commitment in the Constitution of the question of the enemy status of property under the Takings Clause to the Executive Branch." Appellants' Opening Br. at 36–39. The appellants read the Constitution to be silent on the power of the President, and the military he commands, to designate, even in the heat of battle, private property as being enemy property subject to destruction outside the protections of the Takings Clause. This silence, in their view, forecloses entirely adopting the government's position that the political question doctrine requires us to abstain from addressing on the merits their contention that the President erred when he deemed the Plant enemy property. Apparently, the appellants' understanding of the Court's political question doctrine demands from the Constitution an *in haec verba* commitment of the issue in order for a nonjusticiable political question to be present.

The appellants' understanding is flawed for several reasons. As an initial matter, we reject the notion that the test of textual commitment requires in this case an explicit statement in the Constitution committing the issue to the President with the level of specificity the appellants demand. As Justice White explained:

Although Baker directs the Court to search for 'a textually demonstrable constitutional commitment' ... there are few, if any, explicit and unequivocal instances in the Constitution of this sort of textual commitment.... The courts therefore are usually left to infer the presence of a political question from the text and structure of the Constitution. In drawing the inference that the Constitution has committed final interpretive authority to one of the political branches, courts are sometimes aided by

textual evidence that the Judiciary was not meant to exercise judicial review—a coordinate inquiry expressed in *Baker's* 'lack of judicially discoverable and manageable standards' criterion.

*Nixon,* 506 U.S. at 240–41, 113 S.Ct. 732 (White, J. concurring in the judgment) (citations omitted). Moreover, whatever the Constitution says regarding the President's war powers, either explicitly in its text or by its structure, it need not say anything about the Takings Clause *per se* in order for us to conclude that it commits exclusively to the President the power to make extraterritorial enemy property designations. The Constitution either commits this power to the President or it does not. Whether the putative commitment touches on the Takings Clause in particular is of no moment to the analysis. Indeed, the implications of this power for the purposes of claims made under the Takings Clause are readily apparent from the cases discussed above from which the courts have crafted the enemy property doctrine. Once duly exercised, the power transforms private property into enemy property and precludes recovery of just compensation from the government as a result of its destruction. Finally, and more fundamentally, the appellants' argument on this point ignores what the Supreme Court and our predecessor court, have had to say regarding the President's inherent war powers and the ways in which separation of powers principles require that he share it with the Congress and the federal courts.

We think consideration of the decisional law touching on the nature and scope of the President's war powers sheds important light on our present inquiry under *Baker's* "demonstrable textual commitment" test. The Supreme Court has characterized the nature of the President's war powers thusly:

> The Constitution ... invests the President as Commander in Chief with the *power to wage war* which Congress has declared, and to carry into effect all laws passed by Congress for the conduct of war and for the government and regulation of the Armed Forces, and all laws defining and punishing offenses against the law of nations, including those which pertain to the conduct of war.

*Ex parte Quirin,* 317 U.S. at 26, 63 S.Ct. 1 (emphasis added). And where circumstances are such that war is made on the Nation rather than declared by the Congress, the Court has long held that although he may "not initiate the war, [the President] is bound to accept the challenge without waiting for any special legislative authority." *The Prize Cases,* 67 U.S. (2 Black) at 668.

██ In exercising the power to wage war, the President finds authorization in the Constitution itself to "direct the performance of those functions which may constitutionally be performed by the military arm of the nation in time of war." *Ex parte Quirin,* 317 U.S. at 28, 63 S.Ct. 1. Within these functions are "important incident[s] to the conduct of war" such as "the adoption of measures by the military command ... to repel and defeat the enemy...." *Id.* They also include "the power to seize and subject to disciplinary measures those enemies who in their attempt to thwart or impede our military effort have violated the law of war." *Id.* at 28–29, 63 S.Ct. 1; *see also Hamdi v. Rumsfeld,* —— U.S. ——, ——, 124 S.Ct. 2633, 2640, 159 L.Ed.2d 578 (2004) ("The capture and detention of lawful combatants and the capture, detention and trial of unlawful combatants, by 'universal agreement and practice,' are 'important incident[s] of war.'" (citing *Ex parte Quirin,* 317 U.S. at 28, 63 S.Ct. 2)).

In our view, the President's power to wage war must also necessarily include the power to make extraterritorial enemy

property designations because such designations are also an important incident to the conduct of war. As much is borne out of the history of this nation's many declared and undeclared wars, part of which is documented in the cases where courts have applied the enemy property doctrine. The cases teach that the purpose of such designations is almost always to "repel and defeat the enemy" by diminishing the sum of material resources it has at its disposal to prosecute hostilities against the United States and its citizens. Whether the private property destroyed as enemy property is a tank firing rounds at American forces, a bridge the enemy finds necessary to advance to the front, or a commodity, such as oil, imperiled by advancing forces, the aim is the same—to "wage war successfully." *See Hirabayashi v. United States*, 320 U.S. 81, 93, 63 S.Ct. 1375, 87 L.Ed. 1774 (1943) (stating "[t]he war power of the national government is the power to wage war successfully" (internal quotation marks and citation omitted)). We cannot envision how a military commander, much less the Commander–in–Chief, could wage war successfully if he did not have the inherent power to decide what targets, *i.e.,* property, belonged to the enemy and could therefore be destroyed free from takings liability.

Moreover, in one case where the Court of Claims considered the interplay between political question doctrine and the Takings Clause, the court expressly declined to consider a takings claim that arose from military conduct directly traceable to the President's conduct as Commander–in–Chief. As the court recounted in its opinion in *Ingenio Porvenir C. Por A. v. United States*, 70 Ct.Cl. 735, 738 (1930), in 1916, the Navy occupied the Dominican Republic, including its capital Santo Domingo, pursuant to a Presidential proclamation. During the occupation, the provisional government issued a requisition order for the plaintiffs' sugar prohibiting them from selling it on the open market. *Id.* The price of sugar dropped while the requisition order was in effect, and the plaintiffs filed a takings claim against the government seeking just compensation for the loss. *Id.*

The court observed that there were several reasons why it thought the plaintiffs could not recover, but one was certainly dispositive—political question doctrine. *Id.* at 739–40. The court explained that:

> In a general way, the act of taking over the Government of Santo Domingo and all the proceedings thereunder were political matters as to which we have no jurisdiction. Under the Constitution the President is the Commander–in–Chief of the Army and Navy, and this court has no jurisdiction to review his acts in exercising the power so granted in a foreign country and base a judgment thereon. The acts which are claimed to fix a liability on the defendant were done under the orders of the President and occurred in a foreign country. The policy which he adopted and the acts done pursuant thereto were matters of state and wholly within his discretion.

*Id.* at 739. It concluded that the case was controlled by "principles ... settled by a long line of decisions, which hold that such cases as ... [the one that was before the court] ... present political questions exclusively within the jurisdiction of the Executive Department of the Government." *Id.* We think the conclusion of the Court of Claims, whose precedent we are bound to follow, *see S. Corp. v. United States*, 690 F.2d 1368, 1369 (Fed.Cir.1982) (*en banc*), applies with even greater force in this case.

Although we conclude, based on our reading of precedent, that those passages of the Constitution that create and define the President's inherent war powers include within their terms the authority to

make extraterritorial enemy property designations, our analysis under the first *Baker* test is not at an end. This is so because the entirety of the war powers the Constitution creates are not the President's to exercise alone. They are instead shared with the Congress and the federal courts, especially where an individual's right to own and enjoy property is concerned. *See Hamdi*, —— U.S. at ——, 124 S.Ct. at 2650 ("Whatever power the United States Constitution envisions for the Executive in its exchanges with other nations or with enemy organizations in times of conflict, it most assuredly envisions a role for all three branches when individual liberties are at stake."); *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 644, 72 S.Ct. 863, 96 L.Ed. 1153 (1952) (Jackson, J., concurring) (The President "has no monopoly of 'war powers' whatever they are."). As the Supreme Court recently reminded, the President does not enjoy a "blank check" merely because a state of war exists. *Hamdi*, —— U.S. at ——, 124 S.Ct. at 2650 (citing *Youngstown Sheet & Tube Co.*, 343 U.S. at 587, 72 S.Ct. 863).

■■■ With these important separation of powers principles in mind, we conclude nevertheless that the appellants may not seek judicial review of the President's designation of the Plant as enemy property. The appellants' theory of takings liability centers on the alleged inaccuracy of the President's designation of the Plant as enemy property. This must be the case, because as we noted above, if the Plant was in fact the property of al-Qaeda, the appellants would have no claim in takings against the United States for its destruction. In essence then, the appellants are contending that the President failed to assure himself with a sufficient degree of certainty that the Plant was in fact a chemical weapons factory, despite his declaration to the contrary that the information he possessed in 1998 indicated al-Qaeda was using it to manufacture chemi-

cal weapons ingredients. The appellants would have the Court of Federal Claims in the first instance, and this court on appeal, provide them with an opportunity to test that contention, and in the process, require this court to elucidate the constitutional standards that are to guide a President when he evaluates the veracity of military intelligence.

We are of the opinion that the federal courts have no role in setting even minimal standards by which the President, or his commanders, are to measure the veracity of intelligence gathered with the aim of determining which assets, located beyond the shores of the United States, belong to the Nation's friends and which belong to its enemies. In our view, the Constitution envisions that the political branches, directly accountable to the People, will adopt and promulgate measures designed to ensure that the President makes the right decision when, pursuant to his role as Commander–in–Chief, he orders the military to destroy private property in the course of exercising his power to wage war. Today, we need not decide whether and to what extent the Executive and Legislative branches share that responsibility. We conclude only that the Constitution does not contemplate or support the type of supervision over the President's extraterritorial enemy property designations the appellants request in this case.

The circumstances here, under which the Plant was targeted and destroyed, strengthen this conclusion. When the President ordered the Plant destroyed, he exercised the "authority ... the Constitution itself gives the Commander in Chief, to direct the performance of those functions which may constitutionally be performed by the military arm of the nation in time of war." *Ex parte Quirin*, 317 U.S. at 28, 63 S.Ct. 1. In 1998, the President determined that the Plant's destruction

was a necessary and proper response to "the imminent threat of further terrorist attacks against U.S. personnel and facilities." (J.A. at 210.) In his radio address following the strike on the Plant, he maintained that he had "convincing" evidence that the "bin Laden network of radical groups," was responsible for the then recent attacks on United States embassies in Kenya and Tanzania as well as "compelling evidence that the bin Laden network was poised to strike at [the United States] again." President's Radio Address, 2 *Pub. Papers* (Aug. 22, 1998).

Under these conditions, where the President's own assessment of the offensive posture of the Nation's enemies overseas leads him to conclude that the Nation is at risk of imminent attack, we cannot find in the Constitution any support for judicial supervision over the process by which the President assures himself that he has in fact targeted that part of the enemy's wealth of property that he thinks, if it were destroyed, would most effectively neutralize the possibility of attack. In the *Prize Cases*, the Supreme Court was asked to review the correctness of President Lincoln's determination that a state of war existed between the Union and the secessionist States, and pursuant to that decision, to exercise the right of prize and capture on behalf of the United States over the plaintiffs' ships which had been seized pursuant to an embargo. *The Prize Cases*, 67 U.S. (2 Black) at 666–70. On that question, the Court concluded:

> Whether the President in fulfilling his duties, as Commander-in-chief, in suppressing an insurrection, has met with such armed hostile resistance, and a civil war of such alarming proportions as will compel him to accord to them the character of belligerents, is a question to be decided *by him*, and this Court must be governed by the decisions and acts of the political department of the Government to which this power was entrusted.

> "He must determine what degree of force the crisis demands." The proclamation of blockade is itself official and conclusive evidence to the Court that a state of war existed which demanded and authorized a recourse to such a measure, under the circumstances peculiar to the case.

*Id.* at 670. Likewise, as we indicated above, we think that it is up to the President to determine when he has received "convincing" or "compelling" information sufficient to justify the use of force to destroy private property located outside the territory of the United States belonging to a nonresident alien. Such a determination is, in our view, "a core strategic matter[ ] of warmaking belong[ing] in the hands of those who are best positioned and most politically accountable for making them." *See Hamdi*, —— U.S. at ——, 124 S.Ct. at 2647 (citing *Dep't of Navy v. Egan*, 484 U.S. 518, 530, 108 S.Ct. 818, 98 L.Ed.2d 918 (1988), and *Youngstown Sheet & Tube Co.*, 343 U.S. at 587, 72 S.Ct. 863).

Moreover, we wonder how a federal court might go about testing the veracity of the intelligence relied upon by the President in deciding to attack the Plant. On this point, the appellants argue that "the question whether an individual [or his property] is associated with a nation or group hostile to the United States is a question of historical fact which the adversarial system is well-suited to determine." Appellants' Opening Br. at 39. We suspect this characterization belies the complicated and sensitive nature of determining whether private property has in fact been pressed into use by terrorists. More than "questions of historical fact," enemy property designations made pursuant to the President's duty to prevent future terrorist attacks from the country's enemies abroad are often "delicate[ ] and complex" and can "involve large elements of prophecy" at the time at which they are made.

*See Chi. & S. Air Lines, Inc. v. Waterman S.S. Corp.*, 333 U.S. 103, 111, 68 S.Ct. 431, 92 L.Ed. 568 (1948). The appellants' desire for judicial review of the President's decision to target the Plant would most surely give way to the specter of field commanders vetting before the civil courts the intelligence on which they rely in selecting targets for destruction while simultaneously dealing with the exigencies of waging war on the battlefield. The Supreme Court has considered what such a state of affairs would mean for the military's ability to wage war and has stated that:

> It would be difficult to devise more effective fettering of a field commander than to allow the very enemies he is ordered to reduce to submission to call him to account in his own civil courts and divert his efforts and attention from the military offensive abroad to the legal defensive at home.

*Johnson v. Eisentrager*, 339 U.S. 763, 779, 70 S.Ct. 936, 94 L.Ed. 1255 (1950). These concerns apply with equal force here, given the appellants' desire to test the veracity of the information upon which the President claims to have relied in ordering the destruction of their property.[6]

For all of these reasons, we think the Constitution, in its text and by its structure, commits to the President the power to make extraterritorial enemy property designations such as the one made regarding the appellants' Plant.

**D**

The appellants argue further that in the past, courts have looked beyond the President's designation of a takings claimant's property as enemy property, and therefore, the dismissal of their complaint by the Court of Federal Claims on political question grounds is in conflict with precedent. In our view, none of these cases can be read, as the appellants argue they should, to authorize the type of searching inquiry into the accuracy of the President's designation of the Plant as enemy property.

The appellants rely on *Juragua Iron Company*, where the Supreme Court was confronted with a takings claim for the destruction of mining facilities and equipment United States armed forces ascertained were housing "fever germs" that threatened the health of soldiers operating in Cuba during the Spanish–American War. *Juragua Iron Co.*, 212 U.S. at 301–03, 29 S.Ct. 385. The appellants apparently rely on isolated language in the Court's opinion where it stated that the case depended "upon the facts found" by the trial court and in which it concluded that the "circumstances disclosed by the record" demonstrated there was no implied promise by the government to compensate the claimant for its losses. *Id.* at 301, 309, 29 S.Ct. 385.

Aside from being directed to a theory of recovery resting on implied contract rather than takings, this language is a slim reed on which we might find what seems to us to be the sweeping authority of the federal courts to review the President's designation of the Plant as the property of al-Qaeda. The *Juragua* court stated that it could be "assumed that the health, effi-

---

6. We are aware that these concerns also touch on the coordinate inquiry under *Baker* of a "lack of judicially discoverable and manageable standards" for resolving the dispute between the appellants and the government. Although we need not reach this *Baker* criterion, we suspect that even if the concerns expressed in *Eisentrager* did not obtain here, it would be difficult, if not extraordinary, for the federal courts to discover and announce the threshold standard by which the United States government evaluates intelligence in making a decision to commit military force in an effort to thwart an imminent terrorist attack on Americans.

ciency and safety of the troops required that to be done which was done." *Id.* at 302, 29 S.Ct. 385. There is no indication from the Supreme Court's opinion that the claimant disputed the accuracy of the military's determination that its facility did in fact house infectious agents that posed an imminent and immediate threat to the health of its soldiers—a determination analogous to the one President Clinton made here regarding the uses to which the Plant was being put. Consequently, *Juragua* is inapposite because the level of deference owed that determination was never at issue.

*Seery v. United States* is similarly unavailing to the appellants' case. In *Seery,* the Court of Claims was confronted with a takings claim made by a United States citizen concerning the appropriation by the Army of the claimants' estate in Austria as an officer's club during World War II. *Seery,* 127 F.Supp. at 602–03. The court considered in some detail the status of Austria as an enemy of the United States during the war in order to resolve what it believed was a dispositive issue in the case—whether the estate was located within enemy territory and could, as the government contended, be appropriated by the army with immunity. *Id.* at 603–06. Although the government insisted that Austria had been enemy territory during the war, this assertion contradicted the official position of the State Department. The court explained that:

> If we take at anywhere near face value the numerous expressions of the Executive Department, which is responsible for the conduct of our foreign relations, Austria was, after the surrender of Germany, a nation liberated from a German occupation which had never been recognized as lawful by our Government. The property in question, then, was no more subject to uncompensated confiscation than it would have been had it been

located in Holland or France or the Philippines.

*Id.* at 606. The appellant's characterization of *Seery* notwithstanding, the court, in our view, deferred to the government's own official pre-litigation determination that Austria was not an enemy of the United States during World War II. Unlike the instant case, the status of the taken property in *Seery* as enemy property was at odds with the official government policy on the matter. This suggests the government's contradictory assertion during litigation was nothing more than a proffer of counsel, and as a result, it was not worthy of judicial deference. The facts of *Seery* contrast sharply with those of the instant case where explicit statements by the Commander–in–Chief made immediately after the 1998 strikes set forth the official position of the Executive Branch on the question of the enemy status of the Plant.

Finally, we think the appellants' reliance on the *Prize Cases* is at once puzzling and misplaced. The Court's decision in the *Prize Cases* is often cited as authority for judicial deference to the President in the area of war-making. This comes as no surprise since, as we recounted above, the only view the Court expressed on a matter of judicial deference concerned the power of the President to blockade merchant ships engaged in commerce with southern States. On that score, the Court concluded that the declaration of the blockade was itself "official and conclusive evidence" that a state of war existed. *The Prize Cases,* 67 U.S. (2 Black) at 670. The remainder of the Court's exegesis of applicable legal principles concerned the proper definition of the term "enemies' property" in view of the plaintiffs' contention that the property of a citizen or an ally of the United States could not be considered enemy property as a matter of law. *Id.* at 671–74. Nothing in that portion of the Court's opinion

states, much less suggests, that the federal courts have any role in supervising extraterritorial enemy property designations made in the face of imminent attack. Like *Juragua* and *Seery,* the *Prize Cases* do not provide the appellants any basis for disturbing the judgment of the Court of Federal Claims dismissing the complaint.

E

We also do not read the recent decisions in *Hamdi* and *Rasul v. Bush,* — U.S. ——, 124 S.Ct. 2686, 159 L.Ed.2d 548 (2004), to counsel a different outcome than the one we reach today. Those cases concerned the detention, away from the front, of citizen and alien enemy combatants captured on the battlefield. Among the issues considered by the Court in both cases was the legality of the President's decision to hold the detainees indefinitely on soil over which the United States exercises, at the very least, plenary and exclusive jurisdiction, without permitting them access to counsel, giving them an opportunity to contest the factual predicates of their detention before a neutral decision maker, or providing them with other forms of procedural due process.

In contrast, here we are faced with what seems to us to be a fundamentally different set of facts giving rise to the appellants' takings claim. Unlike the enemy combatant designations at issue in *Hamdi* and *Rasul,* whose purpose was to invoke the President's power to detain indefinitely captured enemy combatants, the enemy property designation here was made in view of the President's "go/no go" decision regarding the use of force in what is deemed to be a foreign theater of war and in the face of what he perceived to be an imminent terrorist attack on the United States. To be sure, had President Clinton considered the potential takings liability of the United States before making the instant enemy property designation, he may have experienced a moment of pause before ordering the Navy to destroy the Plant. Nevertheless, for the reasons we discuss above, we are loath to add to the President's calculus concerns regarding takings liability when he exercises his power as Commander–in–Chief to wage war on behalf of the country under the circumstances that obtained in this case.

The appellants credit the President with having formed a good faith belief that the Plant was a chemical weapons factory disguised as a pharmaceutical works, yet they nevertheless question the basis for that belief in an effort to obtain just compensation. We may surmise without deciding that the outcome in this case very well may have been different had there never been any evidence in the record, compelling, convincing, or otherwise, that the President had determined that the property at issue belonged to an enemy of the United States. Faced with a contrary set of facts here, our reading of the Constitution and the Supreme Court's political question doctrine counsels deference to the President's extraterritorial enemy property designation.

In coming to this conclusion, we must emphasize that we express no opinion regarding the President's power, inherent or otherwise, to make enemy property designations over property that is located within the territory of the United States. Here too we might also surmise, without deciding, that the outcome in this case might have been different if the appellants' property were located within the borders of a State rather. than in Sudan. In *Youngstown,* Justice Jackson indicated that the constitutional calculus might be different if a domestic, rather than extraterritorial, enemy property designation were at issue:

> That military powers of the Commander in Chief were not to supersede representative government of internal affairs seems obvious from the Constitution and

from elementary American history. Time out of mind, and even now in many parts of the world, a military commander can seize private housing to shelter his troops. Not so, however, in the United States, for the Third Amendment says, 'No Soldier shall, in time of peace be quartered in any house, without the consent of the Owner, nor in time of war, but in a manner to be prescribed by law.' Thus, even in war time, his seizure of needed military housing must be authorized by Congress. It also was expressly left to Congress to 'provide for calling forth the Militia to execute the Laws of the Union, suppress Insurrections and repel Invasions....' Such a limitation on the command power, written at a time when the militia rather than a standing army was contemplated as the military weapon of the Republic, underscores the Constitution's policy that Congress, not the Executive, should control utilization of the war power as an instrument of domestic policy.

*Youngstown Sheet & Tube Co.,* 343 U.S. at 644, 72 S.Ct. 863 (footnote omitted). Today, we need not reach the complex question of the judiciary's role in balancing the interests of the Congress and the President in exercising that aspect of the war powers that includes the power to make domestic enemy property designations. We raise the issue only to emphasize the limited reach of our holding solely to those extraterritorial enemy property designations the President makes in anticipation of imminent attack on American citizens or military forces.

 Finally, although it was not raised by the appellants in the proceedings before us, we might consider, *sua sponte,* whether or not the test articulated in *Mathews v. Eldridge,* 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976), requires a different outcome in this case. The *Mathews* test is "[t]he ordinary mechanism that [the Supreme Court] use[s] for balancing [the] serious competing interests [of the government and the individual], and for determining the procedures that are necessary to ensure that a citizen is not 'deprived of life, liberty, or property, without due process of law,' U.S. Const., Amdt. 5[.]" *Hamdi,* —— U.S. at ——, 124 S.Ct. at 2646. "*Mathews* dictates that the process due in any given instance is determined by weighing 'the private interest that will be affected by the official action' against the Government's asserted interest, 'including the function involved' and the burdens the Government would face in providing greater process." *Id.* (citing *Mathews,* 424 U.S. at 335, 96 S.Ct. 893). Here, application of the *Mathews* test would require us to balance the appellants' strong interest in not being deprived of their property interest in the Plant without due process against the President's interest and capacity to wage war overseas. In other words, we would have to consider whether providing the appellants additional process to contest the single enemy property designation at bar is worth risking the possibility that the panoply of such decisions the President makes in "waging war successfully" overseas will likewise be subjected to review in the federal courts. In short, we think the question answers itself. The balance, in this case, must necessarily tip in the President's favor.

## V

For the foregoing reasons, the decision of the Court of Federal Claims to dismiss the complaint because it raises a nonjusticiable political question is affirmed.

*AFFIRMED*